**LABAT–ANDERSON, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 94–218C.**

United States Court of Federal Claims.

Jan. 29, 1999.

David T. Ralston, Jr. and Rachel D. Campbell, Washington, D.C., for plaintiff.

Martin F. Hockey, Jr., U.S. Department of Justice, Washington, D.C., with whom were Assistant Attorney General Frank W. Hunger, Director David M. Cohen, and Assistant Director Anthony H. Anikeeff, U.S. Department of Justice, Washington, D.C., and Gary M. Winter, U.S. Agency for International Development, Washington, D.C., of counsel, for defendant.

## OPINION

BRUGGINK, Judge.

This is a suit to recover bid preparation costs. Pending are the plaintiff's motion for partial summary judgment and the Government's motion for summary judgment. The matter was transferred to this judge on October 2, 1998. Oral argument was heard on November 20, 1998. For the reasons set forth herein, plaintiff's motion is denied with respect to both counts I and II, and the Government's motion is granted with respect to count II and denied with respect to count I.

## FACTUAL BACKGROUND [1]

In 1987, the United States Agency for International Development ("AID") launched the Black Private Enterprise Development ("BPED") project, a ten-year project to support and develop the black private sector in South Africa. After conducting a study into the various strategies for achieving this goal, AID conceived the concept of the Black Integrated Commercial Support Network ("BICSN") project, a five-year venture "aimed at promoting greater entry of black firms into the mainstream, formal economy" in that country.[2] RFP § 1.A.1, Mem. in Supp. of Pl.'s Mot. for Summ.J., App. ("Pl.'s App.") at 166.

### I. *The Request for Proposals ("RFP")*

On May 14, 1991, the AID mission in Mbabane, Swaziland issued RFP 91–003 to solicit, proposals for the BICSN project. The RFP contemplated award on a cost-plus-fixed-fee ("CPFF") basis and stated the following four objectives:

- To develop greater access to markets for black-owned enterprises by forging profitable commercial linkages with corporations and other business entities in South Africa;
- To improve the managerial capabilities of targeted black enterprises;
- To increase the long-term employment and wealth creation potential of black enterprises;
- To achieve long-term self-sustainability in many targeted black enterprises by transforming these entities into professionally-managed, formal businesses.

*Id.* at 170–71.

The RFP divided the BICSN project into three principal components: (1) pro-motion/education; (2) technical assistance; and (3) equity capital support. The first component, according to the RFP, would involve "an aggressive, sustained promotion and public education campaign aimed at expanding black enterprises' access to commercial and industrial markets through subcontracting, franchising and other business linkage mechanisms," and would target corporations, support organizations, and black entrepreneurs. *Id.* at 171.

To promote technical assistance to minority businesses in South Africa, the RFP directed the successful contractor to establish and manage the Technical Assistance Fund ("TAF"), a *"progressively* intensive package of training and technical assistance" that would provide varying levels of assistance to three tiers of targeted black enterprises. *Id.* at 172. The RFP stated that the TAF would draw almost exclusively on South African firms and organizations to provide this assistance.

To attract private capital to black-owned enterprises, the RFP required the successful contractor to establish and manage the Black Equity Capital Fund ("BECF"). The equity capital of the BECF would be obtained from private, primarily South African, sources and invested by the successful contractor's BECF manager by taking "minority equity positions in targeted enterprises to provide growth capital and, where appropriate, improve the possibility of attracting loan capital by improving the firms' financial position." *Id.* at 173. The BECF was required to be capable of raising private capital to make these investments and generating a sufficient rate of return to attract significant investment capital.

---

1. The facts are drawn from the record developed by both parties to supplement their briefs on the cross-motions for summary judgment. This record includes the request for proposals, contract documents, evaluators' score sheets, agency memoranda, deposition transcripts, and numerous sworn declarations by AID evaluators and the contracting officer. This accumulation is far from comprehensive. The agency did not, in this case, assemble a formal administrative record. The parties, however, are agreed that there are no genuine issues of material fact that preclude summary judgment, and have agreed to submit the case on the existing record. The parties disagree only with respect to the legal conclusion to be drawn from the undisputed facts.

2. The RFP stated that the "[t]argets of assistance under BICSN are enterprises which are majority-owned by South African citizens belonging to disadvantaged population groups, traditionally people of African, Asian or 'colored' parentage, and broadly referred to as 'black' ". Pl.'s App. at 175.

The RFP also required the successful offeror to establish a Policy Reference Group ("PRG"), a committee of business persons, primarily from disadvantaged communities in South Africa, which would advise the project management on policy issues.

The RFP provided explicitly that offerors should propose "a staff of six professionals (two U.S. and four South African)" to develop and manage the BICSN project for the five-year contract period.[3] *Id.* at 181. This staff consisted of a Chief of Party ("COP"), two Industry Development Specialists ("IDSs"), the BECF Manager, a Technical Assistance Specialist ("TAS"), and a TAF Administrator.[4] Section I.E of the RFP described the responsibilities and desired qualifications for these positions in some detail.

Of particular importance to this protest are the responsibilities and desired qualifications of the COP position. The RFP stated that the COP would serve as the contractor's director of the project and, among other management functions, "oversee and assure the integrity of the Contractor's financial and performance management systems," oversee performance of the BECF, and act as the primary point of contact with AID. *Id.* at 182. The desired qualifications included: "a minimum, combined, ten to fifteen years of management, business promotion and venture capital experience, including at least five years' experience working with black or other disadvantaged enterprises. Experience in developing countries is highly desirable." *Id.* at 183. The RFP further stated that AID, when evaluating COP candidates, would consider the following:

- Management of a project or enterprise of similar magnitude and complexity to BICSN, preferably in a developing country or other Multicultural context;
- Track record of past enterprises assisted and of the venture capital or other debt or equity capital institutions (e.g., U.S. Minority Small Business Investment Corporation) in which the prospective COP had a management role.

Academic background is less important than practical experience, particularly management experience and the ability to demonstrate successful disadvantaged business development, with a venture capital orientation.

*Id.*

The IDS positions entailed numerous supervisory responsibilities relating to the promotion/education and technical assistance aspects of the BICSN project. Among other duties, the IDSs would be responsible for identifying target industries and target black enterprises within those industries for the receipt of technical assistance, and for assessing the performance of the targeted enterprises and the utility of continued assistance. The BECF Manager would be responsible for implementing the BECF and would bear primary responsibility for raising capital from prospective investors, selecting black enterprises to receive capital, negotiating investment terms with these companies, and overseeing the BECF's investments and the investment staff.

The TAS position involved numerous duties relating to the oversight of technical assistance services provided to target black enterprises, including, with the approval of the COP, selection of contractors to receive TAF financing and monitoring of their performance; overseeing the provision of assistance through the TAF based on recommendations of the IDS; and assessing the performance of the TAF contractors, in collaboration with the IDS. Finally, the TAF Administrator would be responsible for bookkeeping and administrative support to the TAF and would establish the accounting and financial reporting and control systems for the fund.

Regarding the duration of the contract, section I.G of the RFP stated that the successful offeror would provide services "for a period of five years, from approximately October 1991 to September 1996," with a possi-

---

3. In addition, the RFP required the contractor to provide additional BECF staff "as is necessary" after fund operations had commenced. *Id.* at 182.

4. In addition to these professional staff, the RFP specified a Management Intern position and two support staff positions.

ble follow-on period at the discretion of AID. *Id.* at 190.

The cover letter to the RFP specified that AID would evaluate proposals "on the basis of technical merit and reasonableness of cost to the Government." *Id.* at 163. Section II.B of the RFP provided additional information on the method of selection:

An Evaluation Committee, consisting of representatives of the Host Government and A.I.D., will be responsible for evaluating and identifying the most technically-acceptable proposal. After completion of the evaluation, the proposals will be ranked in descending order according to scores. The results of the scoring will be submitted to the contracting officer for concurrence. The contracting officer shall use this evaluation, together with his evaluation of the cost proposals, to determine a ranking of offers. He shall then negotiate with one or more firms or organizations to establish which offer is the most reasonable to the Government, and award that offeror the Contract. A best and final offer will probably be required. . . .

*Id.* at 194.

Section II also provided the selection criteria that the Technical Evaluation Committee ("TEC" or "committee") would use to evaluate proposals. The RFP included the following matrix summarizing the categories to be considered by the TEC, and the weighting of each:

| Category | Weight |
|---|---|
| 1. Institutional Experience<br>*Small business development experience<br>*Developing World experience<br>*Venture capital experience | 15 points |
| 2. Technical Approach<br>*Monitoring/Evaluation strategy<br>*Design/Approach to TAF<br>*Design/Approach to Education/Promotion<br>*Design/Approach to BECF | 30 points |
| 3. Contract Personnel<br>*Field staff<br>*Home office staff | 50 points |
| 4. Quality of Proposal | 5 points |

*Id.* at 193.

Section III of the RFP informed offerors of various solicitation instructions and conditions, including that the "Government reserves the right to reject any and all offers and to waive informalities and minor irregularities in offers received." *Id.* at 197.

Section IV of the RFP provided further instructions for offerors regarding the technical and cost proposals. With regard to the former, it noted that proposals should include:

A. Detailed description of the nature and scope of the services offered to meet the technical assistance requirements described in Section I. Include the proposed work methodology, the function and responsibilities of the specialists assigned for the in-country assistance and the support to be provided by the home office. . . .

B. The home office management and field team that will be provided to this specific program and their position in the overall institutional organization.

C. Detailed biographical information of project personnel with a discussion of how such capability was measured.

*Id.* at 229. Regarding biographical information, section IV included a blank copy of AID's Contractor Employee Biographical Data Sheet ("biographical data sheet") to be completed by offerors for each proposed candidate for one of the project positions designated in the RFP. The form required offerors to list the employment history of each candidate for the preceding three years. This section of the RFP also included the following notice:

In presenting the capabilities of your institution and employees who are to be assigned to the work, it is important that the information submitted be complete and detailed, spelling out clearly the relevant specialized professional competence that the organization and individuals possess, their academic backgrounds, and representative accomplishments pertinent to the proposal.

*Id.*

With regard to cost proposals, section IV stated that each offeror's cost information should substantiate that it: "[a.] Has adequate financial resources or the ability to obtain such resources as required during the performance of this contract. . . . [c.] Has a satisfactory record of performance. [d.] Has a

satisfactory record of integrity and business ethics." *Id.* at 235.

## II. *Evaluation of Initial Proposals*

The agency received six technical and cost proposals on or before the July 5, 1991 closing date, including proposals from Labat–Anderson, Inc. ("Labat" or "plaintiff") and Chemonics International, Inc. ("Chemonics").[5] The TEC members individually rated the technical proposals; proposals were then ranked based upon averaged technical scores. After the scores of each of the five members of the committee were averaged, the average scores were compared. Chemonics' proposal was rated highest, with an average score of 86.0; Labat's proposal was rated second, with a score of 77.6.[6] The next highest offeror received a score of 60.7.

David Himelfarb, the chairman of the TEC, sent a memorandum, dated August 9, 1991, to Michael Kenyon, the contracting officer, summarizing the evaluations of the six proposals and reporting the consensus[7] recommendation of the committee that only two proposals—those of Chemonics and Labat—be included within the "technical zone of consideration." Mem. from Himelfarb to Kenyon of Aug. 9, 1991 ("August 9 memo"), Pl.'s App. at 248. The memorandum noted that these two proposals "were superior in all critical respects (institutional capability, technical approach and personnel)." *Id.* It also stated: "It should be noted, that [Labat]'s score of 78[sic] was achieved despite the fact that the Committee recommended the replacement of two key personnel—the COP and the Technical Assistance Specialist. This is an indication of the strength of the [Labat] proposal." *Id.* at 259. It further noted that "the Committee both strongly and unanimously believed that average, aggregate scores below 70 predicted an unacceptable level of performance by the proposers." *Id.* at 248.

The memorandum provided scores and detailed comments on each proposal, organized according to the technical evaluation criteria stated in section II of the RFP. The itemized scores for the Chemonics and Labat proposals were as follows:

| Technical Category | Chemonics | Labat |
|---|---|---|
| Institutional Experience (15) | 12.0 | 11.4 |
| Technical Approach (30) | 27.9 | 25.3 |
| Personnel (50) | 41.2 | 36.4 |
| Quality of Proposal (5) | 4.9 | 4.5 |
| Total (100) | 86.0 | 77.6 |

The comments elaborated on these scores. Both proposals received positive comments for institutional experience and quality of proposal; no faults were noted for either proposal.

Regarding technical approach, Labat's proposal received considerable praise. The TEC noted that Labat: "presented an outstanding monitoring/evaluation strategy;" its TAF approach was "well-structured and thoughtfully presented;" the education/promotion approach was "well designed" and reflected an "excellent understanding" of the activity; and the BECF section indicated that it could "effectively implement this component." *Id.* at 252–53.

This section also raised some concerns, however. Regarding monitoring/evaluation, the TEC noted that Labat's approach could result in poor decision-making and that there was an apparent lack of control of the quality of data input. The TEC questioned Labat's proposed method of selecting TAF recipients based upon receipt of BECF investments or ties to major corporations. The committee further stated:

[T]here appeared to be some confusion between ends and means. For example, the objective of BICSN is not to create a successful prototype of venture capital investments or subcontracting models as in-

---

5. One offeror submitted a proposal after the closing date. The contracting officer returned it to the offeror unopened.

6. At page 2 of the memorandum, Labat's score was reported as "77;" the detailed matrix of scores attached to the memorandum reported the score as "78." The correct score, calculated from the evaluators' scoring sheets, is 77.6.

7. The memorandum was prepared by Himelfarb on behalf of the committee. The other four members of the committee indicated their approval of the recommendation by initialing at the end of the document.

dicated in the proposal. The equity fund and subcontracting mechanism are instruments or means for addressing disadvantaged business development constraints.... Finally, [Labat's] focus on industries such as insurance and banking rather than on high growth sectors with high employment generation potential needs greater analysis. Insurance and banking may have very high barriers to entry and, historically, have posed particularly difficult challenges to black entrepreneurs.

*Id.* at 252. With respect to the BECF, the memorandum stated that Labat's proposal lacked sufficient detail regarding the roles to be played by two subcontractors, JHI International Limited ("JHI") and National Association of Investment Companies. The committee also raised concerns that Labat proposed assigning too many support staff to the BECF and too few to the other components. Finally, the TEC noted a "critical concern" about Labat's approach to the PRG and advised that Labat should be "extremely careful to avoid raising expectations in the business community about serving on the PRG." *Id.* at 253.

Chemonics' technical approach received superlative comments in all areas. The only somewhat negative comment related to the BECF: the memorandum noted that one evaluator believed Chemonics was least comfortable with this aspect of its proposal and was not confident that the effort would ultimately be successful.

The greatest disparity between the two proposals occurred in the most heavily-weighted category—personnel. Three of Labat's professional staff received high praise: the two IDS candidates—Sonny Tarr and Anton Keating—were considered to be a "very strong, complementary team;"[8] the proposed BECF Manager, Gregory Boyd, was rated "exceptionally strong," although the committee emphasized that it needed fur-

ther evidence of his commitment to the project, and more information on his responsibilities and performance while employed by a venture capital company.

The TEC expressed concerns regarding the three other positions, however. It questioned the lack of small business experience of Labat's proposed COP, Mr. Walker, and stated that, "[g]iven the otherwise very strong proposal ..., the firm should consider an alternative COP." *Id.* at 257. Regarding the TAS position, it commented that there was little evidence that Mandi Maepa, Labat's candidate, had the qualifications or background to carry out the various required duties. The TEC noted that, if Labat lacked evidence to refute this concern, it should consider an alternate candidate. With respect to the TAF Administrator position, the committee stated that the qualifications and experience of Labat's candidate, Sabbatha Mofolo, did not clearly relate to the position; therefore, it recommended that the company should provide information pertinent to Mr. Mofolo's ability to manage financial systems and accounts.

Chemonics' personnel candidates received generally favorable reviews by the TEC. The proposed COP, Leyland Hazlewood, was described as having "a wealth of A.I.D.-related experience in rural development, agriculture, and training. He is also founder and CEO of Dimpex (an 8(a) firm), with long-term links to [the Small Business Administration ('SBA')]." *Id.* Because he lacked venture capital and banking/lending experience, the TEC concluded that he was "not the strongest possible candidate," but "he has the capability to fill the position." *Id.* at 258. Chemonics' alternate COP candidate, Joseph Conrad was considered less acceptable because he lacked developing country experience.[9]

Chemonics' first choice candidates for the IDS positions received mixed reviews. Although Alan Hooper had "an outstanding

---

8. The comments noted that Tarr had also been proposed by another offeror, Management Systems International ("MSI"). In the evaluation of that offeror, the TEC stated that he had "strong, relevant experience," and provided "a broad range of important corporate contacts to BICSN and is very knowledgeable of issues confronting

the expansion of subcontracting opportunities." *Id.* at 256.

9. Unlike Labat, Chemonics proposed alternate candidates for each position, and the TEC also commented on these alternate candidates.

experience base," he lacked small business experience or an engineering background. The TEC rated his alternate, Robert Coldwell, *higher, noting he would be an excellent choice." Id.* It added, however, that, because of his age (he was born in 1927), assurance of his good health would be required. The other IDS candidate, Batsile Molebatsi, was considered "very good" even though he lacked an engineering background, and was rated far superior to his alternate.

For the position of BECF Manager, Chemonics proposed a primary candidate, David Brunell, and two alternates. The TEC approved Brunell as the best of these candidates, noting that he had several years of hands-on experience closely related to BICSN. It acknowledged, however, that he had never managed a venture capital portfolio.

Finally, the TEC determined that Gerald Kemp, Chemonics' candidate for the TAS position, and Leonhard Chocho, its candidate for the TAF Administrator, were extremely strong candidates. No concerns were expressed regarding either candidate.

The August 9 memo also set forth the scores of the individual members of the TEC for each proposal. The following scores were reported for Chemonics' and Labat's proposals:

| Evaluator | Chemonics | Labat |
|---|---|---|
| Himelfarb | 80 | 90 [10] |
| Addleton | 88 | 89 |
| Creamer | 90 | 87 |
| Mangera | 80 | 64 |
| Rathbun | 92 | 58 |
| Average | 86.0 | 77.6 |

Three of the TEC members—Creamer, Mangera and Rathbun—rated Chemonics' proposal highest; of these three, Mangera and Rathbun rated Chemonics' proposal significantly higher than Labat's. Notably, however, two members—Addleton and Himelfarb—rated Labat's proposal highest of the six proposals submitted.

Plaintiff asserts that the TEC included Labat in the competitive range even though a majority of the committee did not believe its proposal should be included. To support that assertion, plaintiff offers the following excerpt from Mr. Rathbun's deposition regarding the TEC's decision to recommend a competitive range of two offerors:

**Q:** And from what you recall, two [proposals] were found to be in the competitive range; is that fair?

**A:** I would say there was some dissent within the Technical Evaluation Committee. I personally felt that there was only one firm that should be in the competitive rank based on the proposals that I read, and that firm was Chemonics. There was some concern on the part of other members of the committee that it would be unacceptable to the regional contracting officer to have only one firm in the competitive range. And I think if you average all of the scores together, our recommendation to their regional Contracting Officer was two firms being included in the competitive range.

. . . .

**Q:** Who felt that it would be unacceptable to only have one firm in the competitive range, if you recall?

**A:** My memory of this is kind of fuzzy. I think it was probably Farooq Mangera and David Himelfarb.

**Q:** Do you know on what they base that opinion?

**A:** Farooq had very little experience with evaluating proposals. I think that he didn't know any better, frankly. . . .

**Q:** What about Mr. Himelfarb? Do you know on what he based his opinion that you shouldn't have only one firm?

**A:** Probably limited experience in doing this kind of thing.

. . . .

**Q:** Why would limited experience lead to the conclusion that there should be more than one firm in the competitive range?

**A:** This is speculation on my part, but I think there was a sense on the part of some other members that competitive range—you had to have a competition.

---

10. At page 2 of the memorandum, Himelfarb's score was reported as "89;" the correct score, however, reported in the detailed matrix of scores attached to the memorandum, is "90."

The second stage of competition—you couldn't have the competition if you only had one firm.

Rathbun Dep. of Sept. 24, 1996 at 15–18, Pl.'s App. at 56.

In response, defendant submitted a declaration by Rathbun to explain his deposition testimony:

In my deposition ... I stated that "[t]here was some concern on the part of other members of the committee that it would be unacceptable to the regional Contracting Officer to have only one firm in the competitive range." In no way was that statement intended to convey that there was any covert plan to include Labat–Anderson in the competitive range solely to make it appear that there was a competition. In fact, I recall genuine support from other members of the TEC for the relatively higher scores they gave Labat–Anderson based on their perception of the merits of the initial Labat–Anderson proposal.

I do not recall Mike Kenyon, the Regional Contracting Officer, ever issuing any instructions as to how many firms should be in the competitive range.

Decl. of Daniel Rathbun of July 15, 1997 at 1, Def.'s Opp'n to Pl.'s Mot. for Partial Summ. J., Add. ("Def.'s Add.") at 11. In a subsequent declaration, Rathbun emphasized that "Labat was included in the competitive range because the consensus of the TEC was that Labat's proposal had a reasonable chance of being selected for award." Decl. of Daniel Rathbun of Nov. 21, 1997 at 1, Def.'s Supp. Add. at 1. Moreover, he affirmed that Kenyon never expressed any preference to him regarding the size of the competitive range, either directly or indirectly via other members of the TEC.

The Government also submitted declarations by Addleton, Himelfarb and Mangera stating that they believed Labat's proposal had a reasonable chance of award and, therefore, was properly included within the competitive range. Himelfarb's declaration provided the following explanation for the discussion within the TEC regarding which offerors should be included within the competitive range:

There was some preliminary discussion within the TEC as to whether Labat should or should not be included in the competitive range, particularly in light of the difference in the scores received.... The consensus arrived at by the TEC was that the strengths in Labat's proposal indicated that the firm was capable of carrying out the required work and that Labat should be included in the competitive range based on the quality of its proposal.

Himelfarb Decl. at 1–2, Def.'s Add. at 3–4. Mangera's declaration stated:

It was my conclusion that the proposals of Labat Anderson and Chemonics both had a reasonable chance for award and should both be included in the competitive range.... It never was my position that Labat Anderson's initial proposal should have been excluded from the competitive range.

My evaluation of the proposals, my recommendations for the competitive range and my participation on the TEC were performed without regard to any consideration as to how many offerors the contracting officer might desire to have in the competitive range.

Mangera Decl. at 1, Def.'s Add. at 5. Addleton's declaration noted that he had "concurred" with the committee's conclusion "that Labat's proposal was sufficiently strong to make the 'second cut.'" Addleton Decl. at 1, Def.'s Ad. at 7. Moreover, "[t]he intent of the TEC's deliberations was not to ... create some kind of artificial competition." Id.

In addition, the Government presented two declarations by Kenyon stating that he neither had a preference nor expressed any preference regarding the size of the competitive range to any of the TEC members.

III. *The Competitive Range Determination and the First Request for Best and Final Offers ("BAFOs")*

Kenyon adopted the recommendation of the TEC that only two offerors should be included within the "technical zone of consideration." He reviewed the cost proposals of Chemonics and Labat and determined that the total CPFF proposed by each—$11,795,409 and $9,081,578, respectively—was rea-

sonable.[11] Accordingly, he determined that only Chemonics and Labat would be included in the competitive range. On August 8, 1998, he notified the four unsuccessful offerors that they had not been included in the competitive range.[12]

On August 14, 1991, Kenyon and Himelfarb discussed the comments contained in Himelfarb's August 9 memo by telephone. In response to that discussion, the next day, Himelfarb sent a second memorandum to Kenyon which extracted the comments and recommendations relating to Chemonics' and Labat's proposals from the August 9 memo. The August 15 memo repeated almost verbatim the comments discussed above relating to those two proposals. The memorandum, therefore, suggested that Labat should recommend an alternative to Mr. Walker as COP and, if it could not provide evidence of Ms. Maepa's qualifications to serve as the TAS, it should consider another candidate. In addition, this memorandum for the first time recommended that Labat should propose an alternative candidate for TAF Administrator if Labat could not provide evidence that its initial candidate, Mr. Mofolo, was qualified to develop and manage financial systems/accounts. As in the August 9 memo, the TEC did not recommend any changes to Chemonics' personnel, other than switching the order of the alternate candidates for the position of BECF Manager.

On August 16, 1991, Kenyon sent telexes to Chemonics and Labat informing them that their proposals fell within the "zone of consideration for award." Telex from Kenyon to Walter Malinowski, Vice President for Administration & Finance, Labat of Aug. 16, 1991 ("Labat August 16 telex"), Pl.'s App. at 266; telex from Kenyon to David Dupras, Regional Director, Chemonics of Aug. 16, 1991 ("Chemonics August 16 telex"), Pl.'s App. at 269. These telexes also served as requests for BAFOs, directing the offerors to submit a BAFO that responded to a list of "questions and clarifications, both of a technical and a cost nature" included within the transmittal. Labat August 16 telex, Pl.'s App. at 266; Chemonics August 16 telex, Pl.'s App. at 269. Both offerors were advised that the deadline for the submission of BAFOs was the close of business, August 30, 1991, and that "the technical best-and-final offer will consist of the [response to the questions and clarifications] plus an oral interview to be held during the week of 2–6 September in South Africa. You must attend, bringing at a minimum your nominees for the [COP], [BECF] Manager, and [TAF] Administrator." Labat August 16 telex, Pl.'s App. at 266; Chemonics August 16 telex, Pl.'s App. at 269.

These requests for BAFOs each included a list of technical questions and a list of cost questions/clarifications tailored to each proposal. The request to Labat included nine substantive technical questions, which were restatements of the comments provided to Kenyon in the August 15 memorandum from the TEC.[13] Labat was requested, therefore, to respond to each of the concerns or negative comments set out in the August 9 and August 15 memoranda. Although most of these questions required only written justifications or explanations for approaches suggested in Labat's proposal, at least one required action by Labat: the company was directed to recommend a new COP candidate. In addition, as noted above, Labat was *required to either provide additional evidence*

---

**11.** This step was required by FAR 15.608(a)(1), which instructed contracting officers to evaluate each cost proposal "not only to determine whether it is reasonable, but also to determine the offeror's understanding of the work and ability to perform the *contract.*" 48 C.F.R. § 15.608(a)(1) (1991). Unless otherwise stated, all further references to the FAR or 48 C.F.R. refer to the 1991 edition, which is the edition that governed the events at issue in this protest.

**12.** This notice preceded Himelfarb's August 9 memo by one day. Kenyon acknowledged in a deposition that he was in frequent contact with the TEC chairman during this period in order to resolve questions regarding the procurement as they arose in the TEC. It is not unreasonable, therefore, to conclude that Himelfarb informed Kenyon of the TEC's recommendation orally prior to August 9, 1991.

**13.** The telex to Labat also posed ten "cost questions/clarifications." Although none of these are of individual significance to this protest, these questions, along with the cost questions posed to Chemonics, reveal that Kenyon scrutinized both cost proposals in some detail, as required by FAR 15.608(a)(1).

that Maepa and Mofolo (its candidates for the TAS and TAF Administrator positions) possessed adequate qualifications and experience, or suggest alternate candidates in its BAFO. Labat was also asked to provide further details of Boyd's venture capital background.

The August 16 telex to Chemonics contained only three technical questions and eight cost questions and clarifications. Again, as in the case of Labat, the contracting officer repeated the negative comments or concerns raised in the two memoranda he had received from the TEC. Chemonics was asked to address the impression (created in the mind of one TEC member) that Chemonics was not comfortable with the BECF component of the project and not confident of its success. The only other substantive question related to one of Chemonics' candidates for the IDS position. The question stated that Hooper, the primary candidate in the proposal, lacked small business experience and an engineering background, and that the TEC considered Coldwell, the alternate, to be a better alternative. Chemonics was asked to verify the availability of Coldwell and provide a doctor's certification of his physical condition to allay the TEC's concerns regarding his health. One of the cost questions asked Chemonics to structure Coldwell's salary into its BAFO and provide a biographical data sheet for him.

## IV. Submission of BAFOs

Both offerors submitted written BAFOs by the August 30, 1991 deadline. Each proposed a five-year contract period, from October 1991 to September 1996, consistent with the RFP. The technical proposal of Labat's BAFO addressed each of the TEC's concerns regarding its initial proposal. In response to the committee's concerns regarding Mr. Walker, Labat proposed a new COP candidate, Samuel Harmon. Regarding the TAS position, Labat provided details of Maepa's qualifications and also proposed an alternate candidate. With respect to the TAF Administrator position, Labat presented information pertaining to Mofolo's experience with financial and accounting systems and proposed an alternate candidate. Appended to

Labat's offer were letters of commitment from its primary and alternate candidates; included within these was a non-exclusive letter of commitment from Sonny Tarr.

Chemonics' technical proposal included at least one change to its proposed personnel: it reversed the positions of Coldwell and Hooper, making Coldwell Chemonics' prime candidate for one IDS position. As in its initial proposal, Chemonics proposed Molebatsi for the second IDS position and elected not to propose Tarr.

For the position of COP, Chemonics again proposed Hazlewood. His biographical data sheet, submitted with the revised cost proposal, stated that he was the President and CEO of Dimpex, Inc. ("Dimpex"), a corporation located in Washington, D.C. It stated that he had held that position since 1966 and received a salary of $95,000. The data sheet also stated that he had worked as a consultant on five projects since March 1989.

The text of Chemonics' technical proposal discussed Hazlewood's qualifications in greater depth. It noted that he had founded Dimpex, "built it into a successful international management consulting and research organization with multimillion dollar billings," and directed all company operations until he "left on sabbatical" in 1990. Chemonics' BAFO, Volume I at 101, Pl.'s App. at 420. Since that time, according to the BAFO, Hazlewood had conducted numerous consulting assignments for AID in Africa and was highly recommended by a senior AID Africa Bureau official.

Oral presentations were conducted on September 3–6, 1991 in South Africa. Labat's presentation was held first, on September 3 and 4. On the first day, Labat gave a presentation in support of its proposal, which was followed by a discussion session and a question and answer period. During the latter, the Labat team were asked questions regarding implementation of the BICSN project. On the second day, September 4, Labat presented its proposed first six-month implementation schedule; thereafter, the TEC interviewed Labat's candidates for the COP, TAS and BECF Manager positions. The administrative record does not reveal whether Tarr attended either day of Labat's oral

presentation. It does reveal, however, that on September 4, he signed a nonexclusive letter of commitment with Chemonics.

Chemonics' oral presentation took place on September 5 and 6 and followed the same format as Labat's presentation. Sonny Tarr attended at least part of Chemonics' oral presentation. On September 6, at approximately 2:13 p.m., Thurston Teele, Chemonics' Director, sent a fax from his hotel in Johannesburg to Kenyon at the AID mission in Swaziland. The fax included a one-page letter, which stated in pertinent part:

> Please find enclosed a biodata sheet for Mr. Sonny Tarr, who we now propose as our prime candidate for the position of Deputy Chief of Party/Industry Development Specialist. The opportunity to offer a new candidate for this position arises because ... USAID expressed concerns only about our original prime candidate for this position.
>
> Although in our best and final submission we acceded to the request of USAID and offered our alternate candidate as prime, the resulting fluidity offers us the opportunity to reconsider another candidate who we originally had recruited. . . . Our interview this week with Mr. Tarr confirmed ... the intuition of [our] South Africa Representative ... that Mr. Tarr is extremely well qualified to carry out this position. . . .
>
> Mr. Tarr ... joined us during our best and final interviews. In light of the opening created by the technical evaluation committee's concern about our original prime candidate, we offered Mr. Tarr as a new prime candidate for this position, and offered both Mr. Coldwell and Mr. Hooper as alternates.
>
> Should we be selected for this contract, and should the Selection Committee prefer Mr. Tarr, we are prepared to very quickly submit a cost proposal incorporating the lower costs associated with proposing Mr.

Tarr. As a rough estimate, the change should reduce our costs by $100,000.

Letter from Teele to Kenyon of Sept. 6, 1991 ("Teele letter"), Pl.'s App. at 272. Attached to this letter were a biographical data sheet for Tarr and two letters expressing his nonexclusive commitment to work for Chemonics, dated June 15 and September 4, 1991.

There is a dispute as to whether Chemonics formally presented Tarr at the oral presentation as a replacement for Hooper as an IDS, and thus incorporated him into its BAFO. The Government contends that Chemonics introduced Tarr as an IDS candidate during the oral presentation. Mr. Teele states in his affidavit that "Chemonics included Mr. Tarr in its BAFO as its primary candidate for the Senior ISD [sic] position, with Messrs. Hooper and Coldwell both being proposed as alternate candidates." Teele Aff. of Nov. 24, 1997 at 2, Def.'s Reply Br., Supp. Addendum ("Def.'s Supp. Add.") at 6. This language is consistent with the fourth excerpted paragraph of the Teele letter, *supra*. In addition, the evaluation score sheets prepared by Rathbun and Himelfarb include comments discussing Tarr as one of Chemonics' primary candidates for IDS.

To further support its contention, the Government has submitted declarations by Rathbun, Kenyon, and Teele and affidavits by all of the members of the TEC [14] to the effect that neither Kenyon nor any member of the TEC suggested that Tarr should be added to Chemonics' team. Mr. Teele's affidavit reiterates that Chemonics: obtained a non-exclusive commitment from Tarr in June 1991, prior to the submission of initial proposals; decided to propose him as a candidate in its BAFO after AID criticized the candidate it had proposed in its initial proposal; confirmed Tarr's availability; and then presented him as its new candidate for IDS at the oral presentation.

Plaintiff contends that Chemonics did not propose Tarr as an IDS during the oral presentation. Instead, plaintiff asserts that

---

14. AID submitted affidavits by all five of the TEC members to the General Accounting Office to supplement its agency report in the first protest. Himelfarb's affidavit states that "during the presentations, the TEC did not at any time ... suggest or recommend any ... changes to the proposals or to proposed personnel" beyond those related in the written questions. Aff. of David Himelfarb at 2, Def.'s App. at 337. The affidavits of the other members concur with this statement. These affidavits have been made part of the administrative record in this action.

Chemonics first suggested him as an alternative to Coldwell, the candidate listed in the written portion of its BAFO, in the Teele letter *after* the completion of its oral presentation (and therefore after the completion of all BAFOs). To support this assertion, plaintiff also cites the Teele letter, presumably the first two paragraphs excerpted *supra*, which suggest (by using the present tense) that Chemonics was presenting Tarr as a candidate at that time, i.e. after the oral presentation.

Plaintiff also asserts that Kenyon brought Tarr to the attention of Chemonics during the oral presentation and urged the company to propose him as a substitute for Coldwell, the candidate it had proposed in its written best-and-final technical proposal. To support this assertion, plaintiff refers the court to the September 6 Teele letter which, it contends, provides evidence that AID requested Chemonics to propose Sonny Tarr. The Government asserts that Chemonics proposed Tarr without any involvement of AID.

V. *Evaluation of BAFOs*

Following completion of the oral presentations, and thus completion of the submission of the offerors' BAFOs, the members of the TEC completed their individual evaluations of the BAFOs. The scores of the TEC members were then averaged and compared during a meeting of the TEC. Labat's BAFO received an average score of 62.0; Chemonics' BAFO was scored at 88.4. These scores represented a 15.6 point drop for Labat's proposal and an increase of 2.4 points in Chemonics' score. Most significantly, the disparity between the Labat's and Chemonics' scores had increased to over twenty-six points.

Subsequently, Himelfarb prepared a memorandum for the contracting officer, dated September 11, 1991, to summarize the evaluations of the BAFOs and to report the consensus recommendation of the TEC that the Kenyon should "negotiate a contract with Chemonics." Mem. from Himelfarb to Kenyon of Sept. 11, 1991 ("September 11 memo"), Pl.'s App. at 278. The memorandum noted that the TEC "determined that, on technical grounds, only one

offeror, Chemonics, demonstrated an unequivocable capability to implement the proposed project effectively." *Id.* It further stated that the review of Labat's BAFO—"particularly the interview and discussion sessions—raised serious questions regarding their understanding of the overall project concept and their ability to field a cohesive implementation team." The memorandum continued: "For the Committee, which had earlier included [Labat] in the technical zone of consideration, the firm's disappointing performance during the oral presentation and interviews was a surprise." *Id.* It concluded:

> Despite a strong original proposal presented by Labat–Anderson, the subsequent review of their best and final, including the oral presentations and interviews, suggest that the Labat–Anderson team does not adequately understand the BICSN concept and, further, may not be able to field an effective, cohesive American/South African team. The significant point spread between the two firms (88 for Chemonics and 62 for Labat–Anderson) confirms the marginal nature of their overall proposal and the Committee's lack of confidence in Labat–Anderson's capacity to implement the project successfully.

*Id.* at 284.

Unlike the initial proposals, however, the TEC did not evaluate the BAFOs according to the criteria set out in section II of the RFP. Instead, the committee decided to exclude the "institutional experience" evaluation category, change the "quality of proposal" category to one of "oral presentation" (thus excluding any evaluation of the written portion of the BAFOs), and reallocated the weighting of the three remaining criteria. The TEC stated that the exclusion of the "institutional experience" category was "due to the fact that there was only a one point difference between Chemonics and Labat–Anderson in this category in the initial Committee review of offeror proposals." *Id.* at 279. No justification was given for the other changes. Following these modifications, the scoring system used to evaluate BAFOs was as follows:

| Category | Weight |
|---|---|
| Technical Approach | 20 points |
| Personnel | 60 points |
| Oral Presentation | 20 points |
| Total | 100 points |

The matrix of scores appended to the September 11 memo provided itemized scores broken down by these criteria:

| Technical Category | Chemonics | Labat |
|---|---|---|
| Technical Approach | 18.0 | 12.0 |
| Personnel | 53.0 | 38.6 |
| Oral Presentation | 17.4 | 11.4 |
| Total | 88.4 | 62.0 |

The memorandum provided detailed comments on both BAFOs. Chemonics' BAFO was highly praised by the TEC, which stated that "Chemonics demonstrated a clear sense of what they wanted to do with the project and how they would go about doing it. The result was a well-integrated technical approach linking all project components into a cohesive whole."

Regarding Chemonics' personnel, the memorandum praised Hazlewood for his extensive international business experience, including substantial experience in Africa and some experience working with Chemonics; sensitivity to the cultural environment in South Africa; and knowledge of the BICSN objectives. It noted, as a caveat, that the BICSN project would be his first long-term overseas assignment as a COP. The memorandum also recited the strong credentials of Brunell, the BECF Manager, and noted that his venture capital experience satisfied the committee's earlier concerns. Kemp and Tarr were described as outstanding IDS candidates.

The TEC found Labat's BAFO to be less impressive than Chemonics' in all three evaluated categories. An overarching concern expressed by the committee was that Labat's entire proposal failed to demonstrate that it had a firm grasp of the purpose of the BICSN project, or to reach a decision on the approach it favored to meet the project goals:

All Committee members believed that individual Labat–Anderson team members displayed a lack of consensus and at times even confusion regarding BICSN's underlying conceptual basis and overall objectives. It appeared that the team failed to demonstrate an understanding of BICSN's primary purpose.... Consequently, the team was unable to prioritize how the project's resources should be allocated to achieve this objective.... Generally, Labat–Anderson appeared to go to extremes in trying to please USAID rather than making a case for what they felt was best for the project. This continued to be the case even after the Committee requested (during the first day of meetings) that the team focus (on the second day) on presenting an approach to resource allocation that they really "believed" would be most effective. The team subsequently offered up three options ... and then essentially asked the Committee which one it preferred.

*Id.* at 281–82. The committee also criticized Labat's decision to target prominent business persons to serve on the PRG.

Labat's personnel received mixed reviews. The TEC considered Harmon to be an excellent COP candidate, although he lacked overseas experience and a clear understanding of the BICSN objectives. Tarr was also rated very highly. The TEC expressed concern about Boyd's lack of overseas experience and unfamiliarity with South Africa's economy and capital markets; the committee believed that these factors could handicap his effectiveness in the initial stage of the project.

Maepa was considered to be the weakest candidate, however. The BAFO failed to allay the TEC's concerns regarding her lack of formal business experience—her experience was limited to community outreach programs. The memorandum also noted that she was unable to answer questions regarding her role within Labat's overall project during her interview. This led the committee to express concern regarding the disjunction between the American and South African members of Labat's team. The TEC concluded that it doubted whether Labat could effectively implement the BICSN project.

The September 11 memo reported the following scores for the individual members of the TEC for the two BAFOs:

| Evaluator | Chemonics | Labat |
|---|---|---|
| Himelfarb | 87 | 65 |
| Addleton | 92 | 63 |
| Creamer | 88 | 57 |
| Mangera | 86 | 59 |
| Rathbun | 89 | 66 |
| Average | 88.4 | 62.0 |

All evaluators thus scored Chemonics higher than Labat. Moreover, these individual scores reveal two trends: most of the TEC (three evaluators—Himelfarb, Addleton and Mangera) rated Chemonics' BAFO higher than its initial proposal; in contrast, most of the committee (all except Rathbun) rated Labat's BAFO lower than its proposal. Moreover, three evaluators—Himelfarb, Addleton and Creamer—rated Labat's BAFO dramatically lower (24, 26 and 30 points lower respectively). In addition, the TEC again unanimously rated Chemonics' technical proposal as superior to that of Labat.

VI. *Contract Award*

Shortly after September 11, after reviewing the TEC memorandum and comparing the itemized cost proposals of the two offerors,[15] Kenyon selected Chemonics as the prospective awardee. He determined that its BAFO represented the most advantageous offer to the agency:

I determined that the cost difference, albeit nearly $2 million, was outweighed by the technical difference. Labat Anderson's score[,] 62 out of 100, was quite low in absolute terms, and about 40% below Chemonics in relative terms. Then, Chemonics had always included one extra long-term specialist, (their own innovation and endorsed by the Evaluation Committee), whose presence served to inflate Chemonics' cost somewhat. Finally, the committee's report, indicating Labat Anderson's technical proposal to be marginal, convinced me that an award to Labat

Anderson would be too great a risk of the Government's resources.

Memorandum from Kenyon to File of Oct. 7, 1991 ("October 7 memo"), Pl.'s App. at 287.

The October 7 memo also discussed two revised BAFOs submitted by Chemonics subsequent to the oral presentations:

Chemonics submitted two unsolicited revisions of their technical proposal during the week following best-and-final offer review. The first offered a new candidate as long-term industrial development specialist, and an orientation for the field team. (I emphasize that Chemonics' proposal was fully acceptable and successful with the previously-nominated candidate and without the orientation, as is clear in the technical evaluation report.) The second, actually an alternate-best-and-final proposal, recommended a clerical staff of four instead of two. The Evaluation Committee recommended acceptance of both. Since I considered Chemonics' offer at this point in time to be the successful offer, I was able to accept both changes as revisions to an otherwise successful offer, and thus, in the Government's interest.

*Id.* at 288. The first revision reduced Chemonics' total CPFF to $10,073,954; the second revision increased the total CPFF to $10,183,062. Kenyon accepted both revisions and awarded the contract to Chemonics at a total CPFF of $10,183,060 ($165,912 below the figure stated in its first BAFO) on September 26, 1991.

VII. *Labat's First General Accounting Office ("GAO") Protest*

After receiving the notice of contract award to Chemonics, Labat requested a debriefing. The briefing was conducted by telephone and thereafter confirmed in a writing dated October 3, 1991. Labat filed a bid protest with the GAO the next day. The protest challenged the TEC's evaluation of BAFOs using criteria other than those specified in the RFP. Shortly after the filing of the protest, on October 16, AID issued a

15. Chemonics' BAFO proposed a total CPFF of $10,348,972; Labat's proposed total CPFF was $8,434,320.

stop-work order suspending contract performance pending the GAO's decision.

Labat filed a supplement to its protest on December 5, 1991, based upon information contained in the agency report submitted in response to its initial protest. This supplemental protest contended that AID conducted improper post-BAFO negotiations with Chemonics regarding staffing levels and permitted only Chemonics to amend its BAFO.

GAO sustained the protest on February 18, 1992 on both grounds. It held that AID had improperly deviated from the evaluation criteria specified in the RFP when it evaluated the two BAFOs. It also held that AID erred by failing either to amend the RFP to allow both offerors to propose a larger clerical staff or to reopen discussions with Labat so that it too could submit a revised BAFO. GAO recommended that AID issue an amendment to the solicitation to state the evaluation criteria to be used to evaluate BAFOs and permit offerors to propose additional staff, and request a second round of BAFOs from Chemonics and Labat.

VIII. *The Request for Second BAFOs*

On February 18, 1992, as an immediate result of the GAO decision, AID canceled the stop-work order, thus authorizing Chemonics to resume performance on the contract. The agency subsequently elected to follow the GAO recommendation. On February 24, 1992, the agency issued Amendment No. 1 to the RFP, which permitted the offerors to propose additional staff and established a closing date for receipt of second BAFOs of March 17, 1992. On that same date, Kenyon sent letters to both offerors enclosing this amendment; requesting second BAFOs; confirming that the second round of BAFOs would be evaluated according to the criteria in the RFP; and stating that oral presentations would be held during the week of March 9–13, 1992.

The letter addressed to Chemonics did not address any flaws in Chemonics' first BAFO because none had been identified by the

TEC. The letter sent to Labat, however, asked it to address the following seven "questions and clarifications" in its second BAFO:

> Your individual team members have displayed a lack of consensus and, at times, even confusion regarding the BICSN's underlying conceptual basis and overall objectives. Please demonstrate that you have a clear understanding of BICSN's primary purpose and discuss how you would prioritize how the project's resources would be allocated to achieve these objectives.

> Please describe the approach to resource allocation that you believe would be most effective.

> Please demonstrate your field team's familiarity with the project design and their roles thereunder.

> Please substantiate JHI's claim to having extensive experience in investing in the black community.

> Please replace Ms. Maepa with a candidate who has more familiarity of direct experience with businesses outside the informal sector.

> Please reconsider your approach to the Policy Reference Group. The Technical Evaluation Committee believes that a lower profile strategy would be preferable. Please address this issue.

> Please note that there is some concern about Boyd's lack of overseas experience.

Letter from Kenyon to Labat of Feb. 24, 1992 ("February 24 letter"), Pl.'s App. at 244.

Several days later, on February 28, Kenyon sent a letter to Labat only, informing it that "[t]he TEC will ask questions covering both the concerns raised in my February 24, 1992 letter to you and the technical issues relating to the technical criteria contained in the RFP" during the oral presentation.[16]

On March 2, 1992, Kenyon informed Labat and Chemonics by letter that the closing date for submission of BAFOs had been deferred until March 19, 1992 and that the oral pre-

---

16. This document is not in the administrative record. However, this language was quoted by Labat's counsel during Kenyon's deposition and confirmed by the deponent, *see* Kenyon Dep. of July 17, 1996 at 106–08, Pl.'s App. at 19, and also discussed by AID and Labat in subsequent correspondence.

sentations would be evaluated as an integral part of the BAFOs. The letters confirmed that Chemonics' oral presentation would be conducted on March 12 and Labat's would take place on March 16.

By letter dated March 3, 1992, Labat requested clarification with respect to three questions. First, Labat asked whether the TEC's questions on "technical issues" that would be asked at the oral presentation would relate to any issues not previously conveyed to Labat. The remaining questions concerned the evaluation methodology and weighting of the oral presentations. Also on March 3, Himelfarb prepared a memorandum to Rathbun and Addleton (two of the existing TEC members) and Paul Neifert (a new member of the TEC), informing them that the committee would draft questions to be asked during Labat's oral presentation on March 12.[17]

Kenyon responded to Labat's letter on March 6, 1992. In response to the first question, his letter stated that "questions you are asked will relate to your original and subsequent proposals in terms of the selection criteria in the RFP," which "may not have been specifically asked to you previously." Letter from Kenyon to Malinowski of Mar. 6, 1992, Pl.'s App. at 294. Additionally, he informed Labat that "some questions will relate to the concerns raised in my 24 February 1992 letter." *Id.* Regarding the other two questions, Kenyon reiterated that oral presentations would be considered an integral part of the offerors' BAFOs and accordingly would be evaluated, in conjunction with the written BAFOs, pursuant to the criteria stated in the RFP.

## IX. *Submission of Second BAFOs*

The TEC was reorganized prior to the oral presentations. Three of the five members from the original committee—Creamer, Himelfarb and Mangera—were no longer available and were replaced by two new members, Neifert and Harold Motshwane. On March 9, 1992, Neifert sent a memorandum to the three other members of the new TEC, informing them that he had replaced Himelfarb as the chairman of the committee and stating that the TEC would not prepare any questions to ask Labat's representatives at the oral presentation.[18]

Chemonics' oral presentation took place on March 12.[19] The TEC did not ask any questions during the presentation. Labat's oral presentation was held a few days later, on March 16. For the first time in this procurement, Kenyon joined the members of the TEC at the oral presentation.[20] After Labat had completed its presentation, Labat's president, Walter Malinowski, asked Neifert to read aloud the seven questions stated in Kenyon's February 24 letter. After each question was read, Malinowski asked if Labat had adequately responded to the agency's concerns. Mr. Neifert declined to respond.[21] No questions were put to Labat's team at any time during the oral presentation.

Chemonics and Labat submitted their written BAFOs on the March 19, 1992 closing date.[22] For the first time, Chemonics'

---

17. This document is not included in the administrative record. Kenyon confirmed the existence and content of this memorandum, however, in his July 17, 1996 deposition.

18. This document is not included in the administrative record. However, in his deposition, Kenyon confirmed the existence and discussed the content of this memorandum.

19. Defendant asserted in its proposed findings of fact that Chemonics' oral presentation took place on March 13, 1992; plaintiff did not take issue with that assertion. However, Neifert's affidavit states that the oral presentation took place on March 12, which corresponds with the date specified in the March 2 letters from Kenyon to Labat and Chemonics. This is not a material issue of fact.

20. In his deposition, Kenyon stated that he attended because he was "concerned to see that no extraneous information be requested from Labat–Anderson, that Labat–Anderson not be placed in a position of having to answer questions for which they had not been prepared...." Kenyon Dep. of July 17, 1996 at 112, Pl.'s App. at 20.

21. In his deposition, Neifert explained that he felt it was inappropriate to state his opinion of Labat's BAFO because such action would constitute discussions with Labat.

22. Defendant asserted in its proposed findings of fact that both firms submitted BAFOs on March 17, 1992; plaintiff did not take issue with that assertion. Neifert's affidavit states, however, that the BAFOs were received on the March 19

technical proposal included Sonny Tarr, who replaced Coldwell as an IDS candidate. Chemonics again proposed Hazlewood as its candidate for COP and Molebatsi as one of its IDS candidates. The company submitted re-certified biographical data sheets for both candidates, dated March 4 and March 10, 1992 respectively.

Chemonics' second best and final cost proposal was based on a contract period of 53 months: "The budget presented in the cost proposal ... assumes an effective date of May 1, 1992, and an activities completion date of September 30, 1996, as stated in the RFP, section [I.]G." *Id.* at 302. Chemonics' BAFO proposed a total cost (including its fee) of $8,850,498, approximately $100,000 higher than Labat's total cost.[23] Chemonics' cost proposal included $143,049 [24] for vehicle allowances and stated that "[p]art of [Chemonics' and its subcontractors' employees'] benefits packages include a vehicle allowance which is budgeted under this line item." *Id.* at 316. It also provided that funding for short-term information management personnel would be derived from the TAF. This funding mechanism enabled Chemonics to reduce its total cost by approximately $200,000.

Labat's second best and final technical proposal contained three personnel changes. First, following the instruction given by Kenyon in the letter requesting second BAFOs, Labat replaced Maepa as the TAS candidate with a new candidate, Brian Van Rooyen. Second, for the stated reason that Sonny Tarr had refused to provide Labat with an exclusive commitment (which Labat stated that it required for this round of competi-

tion),[25] the company replaced him with Keith Foster at one of the IDS positions. Finally, Labat proposed Joy Christie as an Information Administrator—a new position proposed by Labat that would include various administrative duties associated with the technical assistance aspect of the BICSN project.

Labat's cost proposal assumed a contract period of five years.

## X. *Evaluation of Second BAFOs*

The TEC followed a procedure for evaluating the second BAFOs similar to the one it had used in the first round: each member prepared an individual scoring sheet and submitted written comments for each offeror; the TEC chairman then used these scoring sheets to calculate average scores for each BAFO and to prepare a memorandum for Kenyon. The TEC evaluated the BAFOs according to the criteria set out in the RFP, in the same manner that they evaluated the initial proposals.

Labat's BAFO received an average score of 63.0; Chemonics' BAFO was scored at 94.25. These scores were not significantly different from those received after the first round of BAFOs: Labat's score rose by one point; Chemonics' score rose by almost four points. Compared to the initial proposals, which were evaluated according to the same criteria, these scores represented a significant departure, however. Labat's score had fallen by more than fourteen points; Chemonics' score had risen by more than seven points. Most significantly, the disparity be-

---

closing date, which corresponds with the closing date specified in the March 2, 1992 letters from Kenyon to Labat and Chemonics. This dispute does not relate to a material fact.

**23.** Labat's second best and final cost proposal is *not included in the administrative record*; therefore, its precise proposed total cost is not in front of the court. Although Labat's complaint and briefs suggest that the difference between the two cost proposals was in the range of $1.2 million, Labat's letter of June 10, 1992 to GAO (supplementing its second protest) acknowledges that the difference was only approximately $100,000.

**24.** This figure is comprised of $76,966 in allowances claimed directly by Chemonics under a "vehicle allowance" line item, and $66,083 included within the "subcontract" line item for

vehicle allowances claimed by AMEX International, Inc. ("AMEX"), one of Chemonics' subcontractors.

**25.** Labat's second BAFO recognized that Tarr was a "Chemonics employee." *See* Def.'s Opp'n to Pl.'s Mot. for Partial Summ.J., App. ("Def.'s App.") at 266. It then stated that its company policy for "this round of competition" was to require exclusive commitments from its candidates to avoid "irreconcilable conflict[s] of interest." *Id.* In both its initial proposal and its first BAFO, Labat had not required exclusive commitments from its candidates and Sonny Tarr had been proposed as a candidate for IDS by Labat and one of its competitors.

tween the ratings of the two BAFOs had increased to more than thirty points.

The itemized scores for the two BAFOs were as follows:

| Technical Category | Chemonics | Labat |
|---|---|---|
| Institutional Experience (15) | 14.25 | 10.25 |
| Technical Approach (30) | 28.75 | 17.25 |
| Personnel (50) | 46.25 | 31.75 |
| Quality of Proposal (5) | 5.00 | 3.75 |
| Total (100) | 94.25 | 63.00 |

A memorandum prepared by Mr. Neifert, the new TEC chairman, summarized the evaluations of the committee members.[26] This memorandum, dated April 2, 1992, made the following recommendation: "Chemonics has produced a clearly superior technical proposal and is the offeror which can perform the contract in a manner most advantageous to the Government. The TEC hereby recommends that the contracting officer make a contract award to Chemonics." Mem. from Neifert to Kenyon of Apr. 2, 1992 ("April 2 memo"), Pl.'s App. at 398. Of greater importance to this protest, the memorandum concluded that Labat's BAFO should no longer be considered to be within the competitive range:

> Even after a second BAFO round, the [Labat] proposal still contains a host of technical deficiencies which the TEC believes could not reasonably be cured through additional discussions or through the introduction of new team members. These deficiencies are reflected in the low overall [Labat] technical score. In essence, the [Labat] BAFO did not adequately articulate a good understanding of the specific issues, concerns and constraints of the problem; the technical approach seemed, at times, to be ad hoc, uncoordinated and unfocused; the proposed team members did not seem to offer a "winning combination;" and the overall project management system was deemed confusing and unwieldy. *These inherent problems with the [Labat] proposal would require major modifications and revisions, and it is the determination of the TEC that the proposal no longer has a reasonable chance of being made acceptable for award.*

*Id.*

The April 2 memo provided detailed comments on both BAFOs. For the third time in this procurement, Chemonics' proposal received high praise from the TEC. In fact, the comments did not provide a single criticism. The memo noted emphatically that "the TEC was unanimous about the superb technical approach and professional personnel contained in the Chemonics' proposal. This feeling was reflected in the very high technical score accorded to Chemonics' BAFO." *Id.* at 395.

With regard to technical approach, Chemonics' BAFO was "commended for its clear reasoning, overall construction, and effective integration of the various project elements into a cohesive, mutually supportive whole." *Id.* It was also described as "well considered," and, "[i]n particular, the goal and purpose of BICSN were well articulated." *Id.*

Regarding personnel, the April 2 memo stated: "Perhaps the strongest part of the Chemonics proposal was the mix of skills and qualifications that its contract personnel bring to the project." *Id.* The memo singled out two candidates for individual comments: Hazlewood was recognized for "'qualities and experience to engage corporate organizations,'" *id.* (quoting comments of Motshwane, Def.'s App. at 190); and Tarr was noted for his "extremely relevant background in the South African corporate and small business development community." *Id.*

---

**26.** The April 2 memo was not approved by each TEC member in its final form, as had occurred for the September 11 memo after the first round of BAFOs. Instead, Neifert prepared the memo after reviewing all of the score sheets, circulated a draft of the memo for comments, and then finalized the memo and sent it to Kenyon. There is no evidence that any of the three other TEC members disagreed with the language of the memo. In fact, one member later expressed his agreement with the conclusions drawn in the memo: "I was convinced ... that Chemonics International offered the best solution to the Government, while the Labat proposal was less viable. In particular, my concerns about Labat were based in part upon Labat's failure to adequately address concerns about team cohesion and personnel that were specifically identified in the written questions provided to Labat." Decl. of Jonathan Addleton of July 7, 1997 at 2, Def.'s Add. at 8.

(citing comments of Neifert, Def.'s App. at 191).[27]

In contrast, the memo noted that Labat's BAFO contained numerous deficiencies. The TEC expressed concern that Labat's principal objective appeared to be to please AID and win the BICSN contract rather than to promote black business development in South Africa. Moreover, "the overall [Labat] technical response was found to be overly process oriented, lacking cohesion and focus in its overall approach.... [Labat] does not have an acceptable understanding of the project problem and goal." *Id.* at 396.

The TEC had significant reservations about Labat's proposed technical approach. The memo commented that: Labat's proposed organizational structure was "ill conceived, with too many personnel reporting directly to the proposed Chief of Party," *id.;* its proposal to divide organization of the BECF was not adequately explained (which was noted as a "serious omission and deficiency,"), *id.* at 397; and its proposal to operate a "socially responsible" capital fund was considered to be misconceived and likely to make it impossible for the BECF to attract sufficient capital. *Id.* The TEC also expressed concern about the information Labat submitted to substantiate the asserted experience of JHI. The committee observed that all of JHI's listed projects were in rural Natal and most involved safari operations,

and noted that "if attempted under BICSN, could leave USAID vulnerable to charges related to the marginalization of the black business sector" and ultimately "prove fatal to the objectives of the project." *Id.* at 397. It concluded that Labat "does not have a true understanding of the goals and objectives of the BICSN project." *Id.*

The TEC also had "serious doubts" about Labat's personnel. *Id.* Five of its candidates were criticized, but the committee focused its criticism on Harmon, the COP candidate. The committee doubted "the ability and dynamism of the COP to manage, direct and provide vision for the overall project," based upon his lackluster performance at the oral presentation and his failure to meet a deadline for submitting a draft report to AID on an unrelated contract in South Africa.[28] The TEC also continued to have concerns regarding the lack of experience of Boyd, the candidate for BECF Manager, even after reviewing Labat's responses in its second BAFO: "The TEC found the [Labat] response to this concern unconvincing, and continue to believe that this lack of overseas experience would contribute to an unacceptable level of performance...." *Id.* at 398.

Three candidates proposed for the first time in Labat's second BAFO were criticized by the committee. The April 2 memo noted that Van Rooyen and Foster, the new TAF

---

27. In addition to these reported comments, a review of the members' scoring sheets reveals further complimentary remarks about both candidates. The remarks regarding Hazlewood are noteworthy in this protest: Rathbun stated that "Hazlewood [sic] has [a] wealth of experience as a businessman and deal maker. Likely to be very effective in [South African] Corporate and Township environments," Def.'s App. at 188; Addleton noted that "the proposed COP had an impressive presence and articulated a strong vision of what the project should be," *id.* at 189; and Motshwane added that "Hazlewood and Tarr stand out as two people who have got what is needed to implement the BICSN project. Hazlewood in particular has got all the qualities and experience to engage corporate organizations." *Id.* at 190.

28. Harmon had served as COP for Labat on a field team that provided technical assistance under an AID contract in South Africa and Swaziland. His duties included filing a draft report with the agency on December 14, 1991. The

report was filed in late January of 1992. Both parties agree that Harmon was ill with pneumonia at around the time of the deadline and that this delayed the submission of his report.

Plaintiff contends that the late report resulted from the illness. Defendant acknowledges that the illness caused part of the delay but not all of it. In his deposition, Neifert stated that Mr. Harmon was granted an extension of time to submit his draft report because of his illness. He recalled, however, that Harmon failed to meet the revised deadline and "took an inordinate amount of time" to submit the report. Neifert Dep. of Oct. 8, 1996 at 71, Pl.'s App. at 87. Furthermore, Harmon subsequently also "took an inordinate amount of time" to submit his final report, and the report, once received, was found to be unsatisfactory. *Id.*

The contentions of the parties do not create any factual dispute. Taken at face value, the assertions reveal that the illness caused Mr. Harmon's draft report to be delayed, but did not excuse the delay entirely.

Administrator and IDS candidates respectively, "created unease among the members of the TEC": Van Rooyen gave a "rambling and confusing [oral] presentation;" and Foster failed to adequately articulate the problem to be addressed by the BICSN project.[29] *Id.* Finally, the committee believed that Christie, the candidate for Information Administrator, lacked an adequate experience or background to satisfactorily perform in that position. "In summary, the TEC found the [Labat] contract team '... unconvincing, unsure, and uninspired....'" *Id.* (quoting comments of Neifert, Def.'s App. at 186).

The scores given by the individual TEC members were as follows:

| Evaluator | Chemonics | Labat |
|-----------|-----------|-------|
| Neifert | 98 | 61 |
| Addleton | 96 | 58 |
| Motshwane | 88 | 82 |
| Rathbun | 95 | 51 |
| Average | 94.25 | 63.00 |

Although the TEC unanimously rated Chemonics' BAFO technically superior to that of Labat (as in the first round), the individual scores reflect a slight disparity of views. One evaluator, Motshwane, rated Labat's BAFO favorably, giving it a score of 82. He praised Labat's strong institutional experience, Labat's personnel (in particular, Foster), and the company's oral presentation.

The other three members of the TEC expressed a different reaction. Their scores averaged less than 57 points, below Labat's earlier scores and well below the tentative 70–point threshold stated by the TEC in the August 9 memo. Their comments reflect the view that Labat's proposal was technically unacceptable: Rathbun noted that he "was not convinced they would be able to successfully implement this extraordinarily difficult project," Def.'s App. at 184; Addleton stated "I have serious reservations about their ability to implement the project effectively, to the extent that [I] am unable to make a case for retaining them within the technical competitive range," *id.* at 185; and the chairman noted that "the proposal was deficient and thus technically unacceptable." *Id.* at 186.

Moreover, comparison of the scores given by TEC members Addleton and Rathbun (the two evaluators who had served on the prior committee) with their earlier scores reveals the following divergence: each rated Chemonics' second BAFO *higher* than both its initial proposal and its first BAFO; each rated Labat's second BAFO *lower* than both its initial proposal and its first BAFO. In fact, Addleton rated Labat's second BAFO forty-one points lower than its initial proposal.

XI. *Exclusion of Labat from the Competitive Range and Contract Award to Chemonics*

Kenyon reviewed the April 2 memo, agreed with its conclusion and, on April 7, 1992, decided to eliminate Labat from the competitive range. On April 9, 1992, he prepared a memorandum for his files summarizing his decision process:

> The Committee found [Labat]'s offer to be unacceptable; to be outside the technical zone of consideration for award of the contract. I reviewed the report and found it to be completely consonant with the RFP's selection criteria.
>
> Based upon the report, I have determined that only Chemonics' offer is within the competitive zone for award of the contract. Chemonics' offer is reasonable in cost, and therefore fully acceptable. I have thus determined to modify contract No. 674–0303–C–00–1064 to incorporate Chemonics' offer, which in effect ratifies the original contract award.

Kenyon Memorandum of Apr. 9, 1992, Pl.'s App. at 388–89.

On April 10, 1992, Kenyon sent a letter to Malinowski informing him that he had determined Labat's BAFO to be technically unacceptable and that he would therefore reactivate Chemonics' contract. His letter stated:

> [T]he Technical Evaluation Committee found your technical proposal to have major technical weaknesses and to be incapable of satisfying the technical objectives of the RFP even if reasonable additional dis-

---

**29.** Motshwane, however, rated Keith Foster as a "strong candidate" for IDS. *Id.* at 187. His views were outweighed by negative comments voiced by Rathbun and Neifert.

cussions were to be held. Furthermore, the Technical Evaluation Committee rated your technical proposal as being clearly far inferior to that of your competitor. Accordingly, the Technical Evaluation Committee has concluded that your proposal no longer has a reasonable chance of being made acceptable. The Technical Evaluation Committee considers your offer to be outside the competitive range for award of this contract.

My review of the Committee's findings indicates that they are in consonance with the evaluation criteria in the RFP. Thus, I have determined to reject your offer as technically unacceptable.

Letter from Kenyon to Malinowski of Apr. 10, 1992 at 1, Pl.'s App. at 399.

Kenyon rejected Labat's BAFO without reviewing the cost proposal submitted as part of its second BAFO. Plaintiff asserts that the contracting officer also did not review the costs proposed by Chemonics prior to ratifying Chemonics' September 26, 1991 contract. The Government contends the opposite is true. Both parties cite statements by Kenyon.[30] It is undisputed, however, that AID did not perform a cost-realism study of Chemonics' second BAFO.

The agency did not terminate the original contract and award a second contract to Chemonics at the lower total cost figure proposed by Chemonics in its second BAFO. Instead, on April 10, 1992, Kenyon lifted the stop-work order on Chemonics' existing contract.[31]

## XII. *Labat's Second GAO Protest*

Labat filed its second protest with the GAO on April 17, 1992, and amended the filing with a supplemental protest on June 10, 1992. These documents alleged the fol-

lowing six principal issues: (1) Chemonics' BAFO was non-responsive because Molebatsi, one of its proposed IDS candidates, was not available to perform the contract; (2) AID had improperly determined Labat's BAFO to be technically unacceptable; (3) the agency had improperly excluded its BAFO from the competitive range without considering cost; (4) AID failed to conduct meaningful discussions with Labat because it did not inform the company of deficiencies in its proposal; (5) AID failed to inform Labat that certain information management personnel costs could be derived from the TAF, or improperly failed to find Chemonics' BAFO was non-responsive because it proposed such use of TAF funds; and (6) Chemonics' BAFO was non-responsive because it proposed a performance period of less than five years.

On July 17, 1992, AID submitted an agency report to GAO responding to the issues raised in Labat's protest letter. In the report, AID admitted that Chemonics' shifting of costs to the TAF was inconsistent with the RFP:

> The agency concedes that by accepting this [cost-shifting] arrangement, it inadvertently altered the requirements of the RFP; it should have amended the RFP to inform [Labat] that its information management personnel could be funded under the TAF or, once it had eliminated [Labat] from the competitive range, it should have negotiated with Chemonics to revise its proposal.

Pl.'s App. at 371.

Responding to Labat's claim that Chemonics' proposed 53-month performance period enabled Chemonics to realize cost savings of $1.2 million, the agency asserted that "the cost savings attributable to that reduced level of effort was not $1.2 million, but approxi-

---

**30.** Plaintiff cites the following portion of Kenyon's deposition:

A: I did not attempt to analyze the difference between costs of the two proposals, because Labat's technical proposal was unacceptable.
Q: Did you do any kind of cost to realism study with respect to Chemonics' second best and final offer in this cost proposal?
A: I can't specifically recall doing so, but I would suspect that I considered these sorts of issues in my review of their cost proposal.

Kenyon Dep. of July 17, 1996 at 145, Pl.'s App. at 26.

Defendant cites Kenyon's April 9 memo: "Chemonics' offer is reasonable in cost, and therefore fully acceptable." *Id.* at 389.

**31.** Chemonics' contract had been suspended for the second time by a stop-work order issued on March 12, 1992, the date of the first (Chemonics') oral presentation in the second BAFO round. The administrative record does not reveal what triggered this second stop-work order.

mately $550,000." *Id.* at 370. To substantiate that claim, attached to the report was a table entitled "Estimate of Savings Realized by Seven–Month Reduction in Level of Effort," which calculated Chemonics' cost savings to be $544,083. The agency report did not represent that AID had conducted a cost-realism study.

Chemonics intervened in the protest and filed comments on AID's agency report with GAO on August 3 and August 19, 1992. The Government asserts, and plaintiff does not challenge the assertion, that in both of these documents, Chemonics' counsel referred to AID's estimate of savings as a "cost realism analysis." [32]

The GAO issued its decision on October 9, 1992. The decision dismissed Labat's first count as untimely: although Labat had alleged in its April 17 protest letter that an unidentified member of Chemonics' team was not available to actually perform on the contract, it did not identify the individual as Mr. Molebatsi until June 1992. The GAO denied the remaining issues on the merits. In denying Labat's protest with respect to Chemonics' proposal of a performance period of less than five years, the Comptroller General noted that the impact of this shortened performance period on Chemonics' price "was apparently resolved by AID through a cost realism analysis" of Chemonics' second BAFO. *Labat–Anderson, Inc.,* 92–2 C.P.D. ¶ 244 at 9 n. 3 (1992).

Plaintiff alleges that AID misrepresented to GAO that it had conducted a cost-realism study in an effort to sway the GAO toward denying Labat's bid protest. Plaintiff presents no evidence other than the reference in the GAO decision to a "cost-realism analysis" conducted by AID. The Government acknowledges that it did not perform a cost-realism study for this procurement but contends that it made no representation to GAO that it had conducted such a study.[33]

## XIII. *Contract Suspensions and Payments*

As noted above, the contract was initially suspended on October 16, 1991, shortly after Labat filed its first bid protest with GAO, by the issuance of a stop-work order. The contract remained suspended until February 18, 1992 (the date GAO issued its decision sustaining Labat's protest), at which time the stop-work order was canceled. AID then suspended the contract for a second time on March 12, 1992, the date of Chemonics' oral presentation, and then lifted the suspension once and for all on April 10, 1992—the date of Kenyon's letter to Labat informing it that Chemonics' contract had been "ratified." In total, Chemonics' contract was suspended for approximately five months.

From the initial award of the contract in September 1991, Chemonics submitted monthly invoices for payment to AID's Project Officer in South Africa. During the period from contract award through March 31, 1992, AID declined to reimburse Chemonics for costs and fees incurred during the periods when the contract was suspended. Accordingly, AID declined to pay invoices submitted by Chemonics for November and December 1991 and January 1992 *in toto;* invoices for September and October 1991 and February and March 1992 were paid pro rata for the days when the contract was not suspended. In total, the agency paid Chemonics $60,699.10 out of invoices totaling more than $308,000 during the work suspension period.

On May 22, 1992, Chemonics submitted a claim for $247,858.24 to AID for the unpaid portions of invoices for the period up to and including March 31, 1992. After deducting certain travel and per diem expenses, AID approved payment of $243,426.20 to Chemonics on July 23, 1992. Chemonics, therefore, received total payments exceeding $300,000 for the contract period through March 31, 1992.[34] Included in this total were "legal

---

32. Neither document is included in the administrative record here.

33. In response to a request for admission during discovery, the agency speculated that GAO mistakenly utilized the term when referring to AID's post-award estimate of savings, influenced perhaps by Chemonics' inaccurate use of the term

"cost realism analysis" in two sets of comments filed with the GAO.

34. Including the additional period of April 1 to April 10, 1992, during which the contract was also suspended, Chemonics received more than $325,000 for services provided prior to the ratification of the contract on April 10, 1992.

fees" and "legal costs" totaling more than $45,000 that Chemonics claimed it incurred during the period from December 1991 to March 1992, presumably as a result of its intervention in Labat's first GAO protest. It is unclear from the record what obligated AID to reimburse Chemonics for these legal fees.

## XIV. Chemonics' Proposal of Mr. Molebatsi

Chemonics proposed Molebatsi as one of its IDS candidates in all three of its proposals submitted to AID. At some point in 1991, Molebatsi provided Chemonics with a letter of commitment, stating his interest and availability to serve as an IDS for Chemonics if it were awarded the contract. The cost proposal of Chemonics' second BAFO stated Molebatsi's proposed salary as 98,241 rands. The biographical data sheet submitted with this cost proposal, which was signed by Molebatsi on March 10, 1992, stated this proposed salary and listed his then-present salary, as general manager at another company, as 154,000 rands.

Prior to and subsequent to this certification of his availability to work for Chemonics, Molebatsi and the company were engaged in salary negotiations. Plaintiff has presented an affidavit by Molebatsi stating that he was seeking a salary above that he was receiving from his then-current employer. On June 1, 1992, he attended a workshop on the BICSN project held by Chemonics, during which salary negotiations were conducted. After that workshop, Molebatsi received a salary offer from AMEX, Chemonics' subcontractor, for the IDS position.[35] He declined that offer, in part because the proposed salary was too low, and never accepted work for Chemonics or AMEX on the BICSN project.[36]

## XV. Labat's Third GAO Protest

While the second GAO protest was pending, Labat continued to research additional protest issues. It discovered that Dimpex Associates, Inc.,[37] a New York corporation incorporated in 1965, had filed a petition for bankruptcy under Chapter 7 of the bankruptcy code on December 5, 1989. The accompanying statements of liabilities and financial affairs filed by the company were signed by Hazlewood, who stated that he was the president of the company. The latter document stated that Dimpex terminated operations on September 30, 1989.[38] It also stated that the company had paid "officer's compensation" of $27,215.26 in the one-year period preceding the bankruptcy filing. Pl.'s App. at 443. In addition, Dimpex submitted accounting records with its bankruptcy filing which reveal that, for the one-year period ending May 31, 1989, the company generated gross revenues of $374,949, paid direct labor costs of $176,937, and paid officer's fees and salaries of $53,912.[39]

---

**35.** Chemonics' cost proposal proposed that one IDS would be an employee of AMEX; the other would be a Chemonics employee.

**36.** In an affidavit dated July 31, 1992, Molebatsi recounted his version of the events surrounding these negotiations. In that affidavit, he speculated that "Chemonics knew prior to March 1992 that it was not going to offer me a compensation package that I would accept." Pl.'s App. at 160. No basis is provided for this assertion.

**37.** Two names appear in the record: "Dimpex, Associates, Inc." and "Dimpex, Inc." There is no dispute, however, that these references concern one and the same company.

**38.** One anomaly in the statement is that Hazlewood's signature is dated August 31, 1989, one month earlier than the declared termination date.

**39.** The statement of financial affairs also revealed that one of Dimpex's creditors was Raymond Malley, a subcontractor to Dimpex on an AID contract in Africa. Documentation filed with the bankruptcy court to substantiate the debt of $23,161.73 owed to Mr. Malley revealed that his attorney requested direct payment of this debt from AID in a letter to AID's Administrator, dated August 9, 1990. AID's Acting General Counsel responded on August 28, 1990, denying the request and noting that "A.I.D. no longer holds monies due Dimpex. In fact, Dimpex now owes money to A.I.D." Letter from John E. Mullen, Acting General Counsel to Jules W. Lindau, Pl.'s App. at 478.

Plaintiff asserts that this correspondence provided AID with notice of Dimpex's financial problems prior to award of the contract. The Government has submitted a declaration by Kenyon stating that he first became aware of Dimpex's bankruptcy after Labat filed its second GAO protest in April 1992.

On July 30, 1992, Labat filed a third and final protest, alleging two further grounds to overturn the contract award. First, the protest alleged that Chemonics' BAFO was non-responsive because Hazlewood did not meet the RFP's mandatory criterion that the COP candidate have "successful disadvantaged business development." This allegation rested upon the assertion that Hazlewood made a series of misrepresentations in his biographical data sheet regarding his company, Dimpex, his status with the company, and his salary. Second, Labat alleged that AID improperly determined Chemonics to be a responsible offeror in light of these misrepresentations. The GAO dismissed this protest as untimely on August 31, 1992.

## XVI. *The Present Action*

Plaintiff filed this bid protest action to recover its bid preparation costs on April 5, 1994. The complaint presents two counts. The first count alleges that AID acted with subjective bad faith in the conduct of the BICSN procurement, thus depriving Labat of fair and honest consideration of its proposal. Plaintiff's principal contention is that the agency pre-determined that the contract would be awarded to Chemonics and concocted a sham competitive negotiated procurement to avoid having to justify a sole source award. The count also includes, as support for the bad faith allegation, that AID: violated numerous FAR regulations and one AID guideline; improperly accepted Chemonics' BAFO even though it contained numerous deficiencies; misrepresented to GAO that it had performed a cost-realism study during the second GAO protest; excluded Labat from the competitive range in retribution for the first GAO protest; and gave other preferential treatment to Chemonics.

The second count alleges that AID's consideration of plaintiff's proposals lacked any reasonable basis and was arbitrary and capricious. At oral argument, plaintiff's counsel clarified that this count focuses upon the agency's finding that Labat's BAFO was technically unacceptable.

40. The plaintiff commenced this action prior to amendment of the Tucker Act by Congress in 1996. *See* Alternative Dispute Resolution Act of

## DISCUSSION

### I. Jurisdiction and Standard of Review

■ The court has jurisdiction over this bid protest action pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1) (1994), which grants it authority to render judgment upon claims for breach of an implied contract to have bids and proposals "fairly and honestly considered." [40] *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1367 (Fed.Cir. 1983) (in banc). Moreover, this circuit has long recognized that the court has jurisdiction to consider actions for the recovery of bid preparation costs founded upon this breach of implied contract theory. *See Heyer Prods. Co. v. United States*, 135 Ct.Cl. 63, 140 F.Supp. 409, 412–13 (1956). In this context, the Federal Circuit has stated:

> Proposal preparation expenses are a cost of doing business that normally are "lost" when the effort to obtain the contract does not bear fruit. In an appropriate case, however, a losing competitor may recover the costs of preparing its unsuccessful proposal if it can establish that the Government's consideration of the proposals submitted was arbitrary or capricious. The standards that permit a disappointed competitor to recover proposal preparation expenses are high and the burden of proof is heavy.

*E.W. Bliss Co. v. United States*, 77 F.3d 445, 447 (Fed.Cir.1996) (quoting *Lincoln Servs., Ltd. v. United States*, 230 Ct.Cl. 416, 678 F.2d 157, 158 (Ct.Cl.1982)).

■ The controlling standard is whether the Government acted in an arbitrary and capricious manner. *See Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1132 (Fed. Cir.1998) (citing *Keco Indus. v. United States*, 203 Ct.Cl. 566, 492 F.2d 1200, 1203 (Ct.Cl.1974)). In *Keco*, the Court of Claims set out four factors that are generally relevant to the determination of whether the government action was arbitrary and capricious:

1996, Pub.L. No. 104–320 § 12(a), 110 Stat. 3870, 3874–75.

One is that subjective bad faith on the part of the procuring officials, depriving a bidder of the fair and honest consideration of his proposal, normally warrants recovery of bid preparation costs. A second is that proof that there was "no reasonable basis" for the administrative decision swill also suffice, at least in many situations. The third is that the degree of proof of error necessary for recovery is ordinarily related to the amount of discretion entrusted to the procurement officials by applicable statutes and regulations. The fourth is that proven violation of pertinent statutes or regulations can, but need not necessarily, be a ground for recovery. The application of these four general principles may well depend on ... whether the error or dereliction occurred with respect to the claimant's own bid or that of a competitor.

492 F.2d at 1203–04 (citations omitted).[41]

The third *Keco* factor is a tool for determining "the degree of proof necessary to prove arbitrary and capricious conduct" rather than an independent basis for determining arbitrary and capricious action. *United States Fidelity & Guar. Co. v. United States,* 230 Ct.Cl. 355, 676 F.2d 622, 630 (Ct.Cl.1982); *see also Logicon, Inc. v.. United States,* 22 Cl.Ct. 776, 782 (1991). This factor is significant in the context of the present action, a negotiated procurement. In negotiated procurements, "the contracting officer is entrusted with a relatively high degree of discretion." *LaBarge Prods., Inc. v. West,* 46 F.3d 1547, 1555 (Fed.Cir.1995) (citing *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 617 F.2d 590, 597–98 (Ct.Cl.1980)). "Because of the breadth of discretion given to the contracting officer in negotiated procurement, the burden of showing this discretion was abused, and that the action was 'arbitrary and capricious' is certainly much heavier than it would be in case of formal advertising." *Burroughs,* 617 F.2d at 598.

## II. The Merits

Plaintiff has asserted a plethora of allegations of agency misconduct, including allegations that AID committed numerous violations of procurement regulations, lacked any reasonable basis for its actions, abused its discretion, and acted in bad faith with regard to plaintiff's proposal.[42] At the core of these allegations is plaintiff's assertion that AID, or more precisely, the contracting officer and the members of the TEC, determined at an early stage of this procurement that Chemonics would receive the contract award (and thus plaintiff would not), regardless of the merits of their proposals or the prices that they submitted. Plaintiff contends that this premature determination of the awardee—the epitome of bad faith agency conduct—led to the agency's commission of numerous violations of procurement regulations as it endeavored to ensure that Chemonics would receive the award, while appearing to conduct a fair and competitive negotiated procurement.

Although the ultimate issue is whether the agency's conduct was arbitrary and capricious, for ease of analysis, the court will separate its analysis of plaintiff's allegations into three categories: violations of procurement regulations; absence of a reasonable basis for the finding of technical unacceptability; and bad faith with regard to the consideration of Labat's and Chemonics' proposals. Because both counts of plaintiff's complaint are based, in part, on alleged violations of procurement regulations, the court will address that aspect of the plaintiff's complaint first.

### A. *Violations of Procurement Regulations*

In its complaint and briefs supporting its motion for summary judgment, plaintiff alleges the following violations of regulations: (1) AID failed to conduct adequate discussions with Labat in contravention of FAR 15.610; (2) AID engaged in technical leveling

---

41. A protester may establish that the Government's action is arbitrary and capricious without satisfying all of these elements. *See Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988).

42. Although plaintiff's complaint states only two counts, subtitled "subjective bad faith" and "lack of reasonable basis for action," count I includes a multitude of allegations of violations of procurement regulations.

prohibited by FAR 15.610(d); (3) the agency failed to give Labat the opportunity to rebut allegations affecting the evaluation of Harmon, its COP candidate, in violation of AID guidelines; (4) AID excluded Labat's second BAFO from the competitive range without considering the prices submitted by the two offerors, in violation of FAR 15.609(a) and (d), and AID Contract Information Bulletin ("CIB") 85–17; (5) AID approved Chemonics' BAFO despite the inclusion of unallowable fringe benefit costs, in violation of FAR 31.205–6; and (6) the agency failed to conduct a cost-realism study of all proposals.[43]

### 1. AID's Discussions with Labat

Labat asserts that AID failed to conduct meaningful discussions with it, and thus violated various provisions of FAR 15.610.[44] Plaintiff alleges violations of the following parts of FAR 15.610:

(b) [T]he contracting officer shall conduct written or oral discussion with all responsible offerors who submit proposals within the competitive range. The content and extent of the discussions is a matter of the contracting officer's judgment based on the particular facts of each acquisition....

(c) The contracting officer shall—

. . . .

(2) Advise the offeror of deficiencies in its proposal so that the offeror is given an opportunity to satisfy the Government's requirements;

(3) Attempt to resolve any uncertainties concerning the technical proposal and other terms and conditions of the proposal;

. . . .

(5) Provide the offeror a reasonable opportunity to submit any cost or price, technical, or other revisions to its proposal that may result from the discussions.

48 C.F.R. § 15.610(b), (c)(2), (3) and (5). "Discussion" is defined as "any oral or written communication between the Government and an offeror (other than communications conducted for the purpose of minor clarification) ... that (a) involves information essential for determining the acceptability of a proposal, or (b) provides the offeror an opportunity to revise or modify its proposal." *Id.* § 15.601. "Clarification" in turn is defined as "communication with an offeror for the sole purpose of eliminating minor irregularities, informalities, or apparent clerical mistakes in the proposal.... Unlike discussion ..., clarification does not give the offeror an opportunity to revise or modify its proposal, except to the extent that correction of apparent clerical mistakes results in a revision." *Id.*

Plaintiff's essentially raises three concerns with the manner in which Kenyon conducted negotiations with it following his decision to request a second round of BAFOs: (1) the agency never identified technical deficiencies in either Labat's initial proposal or its first BAFO, and thus never engaged in discussions with Labat; (2) AID failed to ask any new questions of Labat during the second round of discussions, or to express that the agency had greater concerns with its first BAFO than its initial proposal; and (3) the agency failed to ask Labat's team any questions during the second oral presentation even though it considered Labat's BAFO to be technically deficient.

■ Both the FAR and this court's case law recognize that a contracting officer has broad discretion in conducting negotiations with an offeror. *See id.* § 15.610(b); *Burroughs*, 617 F.2d at 598; *CACI Field Servs., Inc. v. United States*, 13 Cl.Ct. 718, 734 (1987) (citing *Action Mfg. Co. v. United States*, 10 Cl.Ct. 474, 479 (1986)), *aff'd*, 854 F.2d 464 (Fed.Cir.1988). Consequently,

---

**43.** In addition, plaintiff alleges implicitly that AID violated numerous other unspecified regulations. For example, plaintiff challenges AID's acceptance of Chemonics' second BAFO despite alleged misrepresentations regarding two key personnel. This issue, as well as other issues only implicitly raising FAR violations, will be addressed *infra*.

**44.** FAR Part 15 was rewritten and extensively reorganized subsequent to the events at issue in this bid protest. *See* 62 Fed.Reg. 51,224 (1997); *see also supra* note 11. The Part 15 "rewrite" took effect on October 10, 1997. *See* 62 Fed.Reg. at 51,224. As a consequence, the Part 15 provisions discussed in this opinion no longer exist. However, many of the discussed provisions are included in a revised form in the Part 15 rewrite, albeit in re-numbered provisions.

plaintiff bears a heavy burden of proof with regard to this issue. *See Burroughs,* 617 F.2d at 598.

▪ Plaintiff's first contention is that AID failed to conduct discussions with it because it never identified any "deficiencies" in Labat's proposal in either round of discussions—i.e., in either the August 16, 1991 telex or the February 24, 1992 letter sent to Labat. Neither the FAR nor case law, however, requires a contracting officer to use explicitly the term "deficiencies." *See CACI,* 13 Cl.Ct. at 734; *see also, e.g., PRI, Inc.,* 84–1 C.P.D. ¶ 345 at 6 (1984) (rejecting argument that discussions were inadequate because the agency failed to identify explicitly "weaknesses" or "deficiencies" in the protester's proposal). Rather, an agency is obligated simply to conduct meaningful discussions by advising each offeror of "deficiencies in its proposal so that the offeror is given an opportunity to satisfy the Government's requirements." [45] FAR 15.610(c)(2). A contracting officer, therefore, " 'must lead offerors into the areas of their proposals which require amplification' " to correct aspects of proposals that do not satisfy the solicitation requirements. *CACI,* 13 Cl.Ct. at 731 (quoting *Furuno U.S.A., Inc.,* 86–1 C.P.D. ¶ 400 at 5 (1986)). However, "agencies are not obligated to conduct all-encompassing discussions, that is, to address in express detail all inferior or inadequate aspects of a proposal." *Id.; see also, e.g., Applied Cos.,* 98–2 C.P.D. ¶ 52 at 8 (1998) (stating that agencies are not required to " 'spoon-feed' an offeror as to each and every item that must be revised or otherwise addressed to improve a proposal").

Plaintiff asserts that the communications between it and AID did not rise to the level of discussions. Presumably, therefore, plaintiff would categorize the communications as "clarifications." As noted above, clarifications are "for the sole purpose of eliminating minor irregularities, informalities, or apparent clerical mistakes in the proposal," 48 C.F.R. § 15.601; the offeror may subsequently correct clerical mistakes but does not have the opportunity to submit a revised proposal. The court disagrees with plaintiff's characterization.

The negotiations conducted by Kenyon with plaintiff consisted of two rounds of written questions presented to Labat: (1) after the TEC had completed its evaluation of initial proposals; and (2) after evaluation of the first set of BAFOs. On both occasions, plaintiff was asked to respond to AID's "questions and clarifications" regarding its prior proposal. The agency's styling of these communications is not controlling, however; nor is its failure to use the term "discussions." *See EG & G Wash. Analytical Servs. Ctr.,* 91–1 C.P.D. ¶ 349 at 6 (1991); *Mech El, Inc.,* 89–1 C.P.D. ¶ 175 at 3–4 (1989). In both rounds of negotiations, the communications satisfied the FAR criteria for discussions. First, plaintiff was given the opportunity to revise its proposal by submitting a BAFO. *See Development Alternatives, Inc.,* 98–2 C.P.D. ¶ 54 at 8 (1998) ("The acid test of whether discussions have been held is whether it can be said that an offeror was provided the opportunity to revise or modify its proposal."); *International Data Sys.,* 97–2 C.P.D. ¶ 96 at 3 (1997). Second, these questions were undoubtedly communications regarding information "essential for determining the acceptability of its proposal," *Phoenix Med. Elecs. Servs.,* 90–1 C.P.D. ¶ 312 at 3 (1990) or regarding "aspects of its proposal that must be addressed in order for it to have a reasonable chance of being selected for award." *Boeing Sikorsky Aircraft Support,* 97–2 C.P.D. ¶ 91 at 12 (1997); *see also CACI,* 13 Cl.Ct. at 731–32. For example, in the first round of discussions, Labat was directed to replace its COP candidate; in the second round, plaintiff was instructed to replace Maepa, its TAS candidate. These directions to replace key personnel cannot be construed as corrections of minor irregularities. Rather, the court agrees with the finding of the GAO that AID engaged in discussions with Labat. *See Labat,* 92–2 C.P.D. ¶ 244 at 10.

Furthermore, the court holds that the discussions were meaningful. A comparison of the TEC's memoranda summarizing the eval-

---

**45.** "Deficiency," in turn, is defined by the FAR as "any part of a proposal that fails to satisfy the Government's requirements." 48 C.F.R. § 15.601.

uations of Labat's initial proposal and first BAFO with the respective sets of written questions (sent in the August 16 telex and the February 24 letter, respectively) reveals that Kenyon's discussions with plaintiff were beyond question "meaningful." The August 16 telex presented Labat with ten detailed questions regarding its technical proposal. These questions were closely tailored to all of the areas of criticism reported by the TEC in the August 15 memo. In fact, many of the questions in Kenyon's telex related the concerns expressed in the TEC memo verbatim. For example, the telex informed Labat that its COP candidate was considered to be a weak choice because his banking experience had been "far from the 'trenches' of entrepreneurial development;" likewise, Kenyon noted that the TEC had raised a "critical concern" about Labat's approach to the PRG.

Moreover, plaintiff was put on notice that it needed to provide amplification in the areas of its technical proposal that related to these nine questions. Kenyon's telex provided instructions to Labat regarding the corrective measures that it should take in its BAFO. For example, with regard to its key personnel, Labat was directed to propose a new COP candidate because Mr. Walker was considered by AID to be one of the weakest aspects of Labat's proposal. Kenyon also directed Labat either to submit documentation to substantiate the qualifications and experience of Maepa and Mofolo or to propose alternative candidates. Without question, Labat was notified of the areas of its initial proposal that failed to satisfy the Government's requirements—i.e. of the deficiencies in its proposal—and was given an opportunity to submit a BAFO that addressed these deficiencies. The first round of discussion were, therefore, clearly meaningful.[46] In fact, it is difficult for the court to imagine

how Kenyon could have made these written questions any more explicit.

The second round of discussions, which followed plaintiff's successful GAO protest, was similarly tailored by Kenyon to notify plaintiff of the concerns raised by the TEC regarding its prior proposal. Kenyon's February 24, 1992 letter to Labat asked the company to address seven specific concerns regarding its best and final technical proposal. These discussion questions encapsulated all of the concerns raised in Mr. Himelfarb's September 11, 1991 memo summarizing the TEC's evaluation of the technical proposals submitted with the first round of BAFOs: Labat's failure to demonstrate a clear understanding of the primary goal of the BICSN project or the familiarity of its team with the project design; its failure to express any preference for the most effective approach to resource allocation; Labat's decision to use a high profile approach with the PRG; its failure to address the TEC's concerns regarding JHI's experience with the minority community or Boyd's overseas experience; and Maepa's lack of formal business experience.

Kenyon's letter directed Labat to revise its BAFO to address all but one of these concerns.[47] The letter asked Labat to provide further detail in the three areas of its technical approach questioned by the TEC; submit evidence of JHI's minority investment experience; consider a lower profile strategy to the PRG; and propose a replacement for Maepa. By requesting these modifications, AID notified plaintiff that it would need to address these six items for it to have a reasonable chance of being selected for award. Plaintiff should have realized, therefore, that AID considered these items to be deficiencies. The court finds that this second round of discussions provided Labat adequate notice of the deficiencies in its best and final technical proposal. The discussions, therefore, were meaningful.[48]

---

**46.** The court, therefore, agrees with the holding of the GAO in the second protest. *See Labat*, 92–2 C.P.D. ¶ 244 at 10–11.

**47.** The final concern expressed by Kenyon—Boyd's lack of overseas experience—was not accompanied by a request that Labat propose an alternative candidate or submit additional information to substantiate his experience. The February 24 letter simply noted that AID had reservations about Boyd. This suggests perhaps that

the agency did not consider Labat's nomination of Boyd to rise to the level of a deficiency. Presumably, however, the TEC would have deducted points from Labat's personnel evaluation score because of this lack of experience.

**48.** This holding is in accord with that of the GAO on this issue. *See Labat*, 92–2 C.P.D. ¶ 244 at 10–11.

The second discussion-related issue raised by plaintiff is whether the agency erred by failing to inform plaintiff that the TEC held "greater" concerns regarding its BAFO than the initial proposal, or that the concerns "had risen to the level of a technical deficiency." Pl.'s Compl. at 9. Plaintiff also raises a related concern, that Kenyon failed to ask it any new questions in the second round of discussion. As discussed above, Kenyon's communications with plaintiff identified numerous deficiencies in both its initial proposal and first BAFO. Furthermore, there is no requirement either in the FAR or the case law that a contracting officer advise an offeror whether its first BAFO contains more or fewer deficiencies, or is more or less technically acceptable, or received a higher or lower technical score, than its initial proposal. A contracting officer's duty is simply to inform the offeror of the deficiencies in its proposal and thus lead it into those areas of its proposal that require amplification in the subsequent BAFO. *See Analytical & Research Technology, Inc. v. United States,* 39 Fed.Cl. 34, 48 (1997) (citing *SRS Techs.,* 94–2 C.P.D. ¶ 125 at 6 (1994)); *CACI,* 13 Cl.Ct. at 731–32; *Boeing Sikorsky,* 97–2 C.P.D. ¶ 91 at 12. Kenyon complied with this duty by informing plaintiff of all of the deficiencies identified by the TEC.

Plaintiff also contends that the second round of discussions was flawed because Kenyon asked no new questions of plaintiff. This allegation is based upon an inaccurate representation of the administrative record. Kenyon's August 16 telex addressed nine technical questions to Labat; the February 24 letter presented seven questions and clarifications. Although there was some overlap between these questions, none of the second round of questions were identical to the earlier questions. Five of the questions in each round related to the same general issues: Labat's approach to the TAF and the PRG; JHI's experience; and the lack of experience of Maepa and Boyd. Nevertheless, even with regard to these five questions, the questions asked in the second round were responsive to plaintiff's first BAFO and refined issues raised in the first round rather than repeating the same requests. For example, in the first round, Labat was asked to propose an alternative to Maepa or submit information to show that she was qualified for the TAS position; in the second round, having determined that Maepa lacked sufficient experience, Kenyon directed Labat to propose an alternative candidate. The two questions are different. Likewise, the questions relating to Labat's allocation of resources under the TAF are starkly different. In the first discussion round, the TEC expressed concerns regarding Labat's decision to target recipients of BECF funding or with links to major corporations, and to focus upon established, low-growth industries. In the second round, after Labat elected in its BAFO to present three alternative strategies and let AID choose the best one, the agency's question asked Labat to recommend the most effective approach. The other "same issue" questions in the second round were distinct from the questions posed in the earlier round.

The remainder of the questions did not even share common themes. In the first round, the remaining four questions addressed concerns with Labat's approach to the Evaluation/Monitoring and Education/Promotion aspects of the project; and AID's concerns regarding the initial COP and TAF Administrator candidates. In the second round, the remaining questions related to the Labat team's understanding of the primary purpose of the project and the familiarity of its key personnel with the project design and assignment of roles. In sum, the distinct differences between the two sets of discussion questions demonstrates that the questions were tailored to each of Labat's proposals, and thus reflect meaningful discussions with plaintiff.

Plaintiff's final contention is that AID improperly declined to enter into discussions with plaintiff during the March 1992 oral presentation even though the TEC later found the second BAFO to be technically unacceptable. Plaintiff fails to realize, however, that the oral presentation constituted part of the second BAFO, not part of the discussions. In fact, the FAR precluded any discussions after AID issued its request for

BAFOs on February 24, 1992.[49] *See* FAR 15.611(a). The TEC acted in compliance with the FAR by refusing to engage in discussions during the oral presentation.

Furthermore, Kenyon's failure to comply with the representation in his February 28, 1992 letter—that the TEC would ask questions during the March 1992 oral presentations regarding the concerns expressed in the written discussion questions—cannot rise to the level of a violation of law. AID had no legal obligation to present questions to Labat at the oral presentation, either under the FAR [50] or case law, or under a contract theory. The agency was free, therefore, to change its mind and decline to ask any questions at the oral presentation.

## 2. Technical Leveling

 AID improperly permitted Chemonics to amend its first BAFO to include Tarr either during, or immediately after, the March 6, 1992 oral presentation. That violation, however, is moot in this present action because the GAO held that AID had permitted Chemonics to submit an amendment to its first BAFO without providing the same opportunity to Labat. *See Labat–Anderson Inc.*, 92–1 C.P.D. ¶ 193 at 9–10, 71 Comp. Gen. 252, 259 (1992). The agency complied with GAO's recommendation to request another round of BAFOs, mooting any contention in this action regarding the first competition. The issue remains, however, whether either Kenyon or any members of the TEC engaged in technical leveling because such conduct would also impact the second round of BAFOs. This allegation was first raised by plaintiff in its proposed findings of fact and memorandum in support of its motion for partial summary judgment. Although plaintiff did not identify any statutory or regulatory provision that prohibits technical leveling, the court will treat this allegation as challenging AID's failure to comply with FAR 15.610(d). That provision states:

> The contracting officer and other Government personnel involved shall not engage in technical leveling (i.e., helping an offeror to bring its proposal up to the level of other proposals through successive rounds of discussion, such as by pointing out weaknesses resulting from the offeror's lack of diligence, competence, or inventiveness in preparing the proposal).

48 C.F.R. § 15.610(d).

Plaintiff asserts that the agency violated this regulation by suggesting, during Chemonics' first oral presentation, that it should replace one of its proposed IDS candidates with Sonny Tarr, a candidate who was proposed in Labat's BAFO and rated very highly by the TEC. Plaintiff's claim, however, is unavailing because it is refuted by the entirety of the direct evidence relating to this issue.

The only document offered by plaintiff to support its assertion is the September 6 Teele letter. Plaintiff interprets this letter as stating Chemonics' intent to propose Tarr at some time after the oral presentation. Plaintiff also notes the timing of the addition of Tarr to Chemonics' team and argues that Tarr's substitution was the "obvious result of

49. The court recognizes that the organization of this procurement was highly unusual. For example, the February 24 letter constituted the entirety of the second round of discussions, yet that letter, because it included a request for BAFOs, also constituted the completion of discussions. A second unusual procedure was AID's election to hold oral presentations before the submission of written BAFOs in the second round of competition. Neither procedure is prohibited by the FAR, however, nor did plaintiff challenge the agency's election to conduct the procurement in this manner.

50. The FAR does contemplate, however, that contracting officers or their representatives, such as a TEC, may engage in limited communications with offerors after the submission of BAFOs. These communications are limited to clarifications of an offeror's BAFO. *See Data General Corp. v. Johnson*, 78 F.3d 1556, 1561 (Fed.Cir. 1996) ("Once bidders have submitted their BAFOs, the Government may seek 'clarification' of a bid, but cannot engage in 'discussion' with a particular bidder."); *Development Alternatives*, 98–2 C.P.D. ¶ 54 at 8. The TEC, therefore, could have asked questions to clarify its understanding of Labat's proposed approach or to address minor irregularities in the second BAFO, provided that plaintiff was not provided an opportunity to revise its proposal. The fact that it did not do so indicates only that the TEC understood plaintiff's proposed technical approach and had no need to request elaboration.

the recommendation of the TEC during the oral interviews." Pl.'s Reply Br. at 9.

Plaintiff's argument cannot prevail in light of the overwhelming documentation indicating that no improper communications were made at the oral presentation, and that Chemonics was endeavoring to add Tarr to its team prior to September 6, 1991. On the first point, defendant has presented affidavits by all five then-TEC members stating that the TEC did not suggest adding Tarr to Chemonics' team. These affidavits are supported by Teele's declaration, which states that Chemonics received no communications regarding Tarr, and by Kenyon's declaration that he did not communicate with Chemonics in this regard. On the second point, it is clear that Sonny Tarr was known to at least three offerors prior to the oral presentation: Labat, MSI (which proposed Tarr in its initial proposal), and Chemonics. Chemonics obtained letters of commitment from Tarr dated June 5 and September 4, 1991. These letters confirm that Chemonics discussed Tarr's potential involvement in the BICSN project prior to the oral presentation. Moreover, Teele's declaration and the BAFO evaluation sheets confirm that Tarr attended the first day of Chemonics' oral presentation on September 5, and was identified as one of its IDS candidates at that time.

The court holds that the evidence presented by the Government is sufficient to support its cross-motion for summary judgment, and that the evidence submitted by plaintiff is insufficient to raise a genuine dispute on this issue.

### 3. Exclusion of Labat's Second BAFO from the Competitive Range

Labat contends that its second BAFO was improperly excluded from the competitive range because Kenyon failed to consider cost as part of this decision as required by AID CIB 85–17 and the FAR. CIB 85–17 does not discuss selection of the competitive range; however, the instructions attached to the Bulletin provide that "[a] proposal is in the competitive range unless it is so technically inferior or out of line with regard to price that meaningful negotiations are precluded, or, that there is no possibility that it can be

improved to the point where it becomes acceptable." Attach. to CIB 85–17 at 4, Pl.'s App. at 380.

Plaintiff has failed to present any evidence, however, that either CIB 85–17 or the attached instructions constituted a binding agency regulation entitled to the force and effect of law, which is a necessary predicate to establishment of arbitrary and capricious agency action. *See Lincoln Servs.*, 678 F.2d at 164. In *Hamlet v. United States*, 63 F.3d 1097 (Fed.Cir.1995), the Federal Circuit formulated the following test:

> [A] regulation [is] entitled to the force and effect of law if (1) the promulgating agency was vested with the authority to create such a regulation; (2) the promulgating authority conformed to all procedural requirements, if any, in promulgating the regulation; (3) the promulgating agency intended the provision to establish a binding rule; and (4) the provision does not contravene a statute. In determining whether a provision was intended to be binding, the court should consider (a) whether the language of the provision is mandatory or advisory; (b) whether the provision is "substantive" or "interpretive"; (c) the context in which the provision was promulgated; and (d) any other extrinsic evidence of intent.

*Id.* at 1105.

To have the force and effect of law, therefore, a regulation must, at the very least, be promulgated by an agency with the intent that it establishes a binding rule. Promulgation requires some act of publication, i.e., dissemination to the public. *See* Webster's Third New Int'l Dictionary 1816 (1976) (defining the verb "promulgate" as "1: To make known (as a decree, a dogma) by open declaration ... [2]b: To issue or give out (a law) by way of putting into execution[;] c: To make public as having the force of law[;] d: To announce officially"). The Government submitted an affidavit by Kathleen O'Hara, Chief of the Policy Division in AID's Office of Procurement, who is responsible for the agency's CIB system. Ms. O'Hara stated that CIBs are distributed only to contracting personnel within the agency and "are not

made available to the public and are not for the benefit of the public." Aff. of Kathleen O'Hara, Def.'s Add. at 10. The provision at issue here is found within an attachment to CIB 85–17, which provides instructions to TECs. The attachment is in the form of a memorandum from the "Contracting Officer" to the "Project Officer" of a TEC, which supports the agency's assertion that it was distributed only to selected officials within the agency. The court concludes that CIB 85–17 was never promulgated by AID.

Furthermore, the Government submitted evidence that CIB 85–17 "was not intended by the agency to be a regulation" but rather was distributed to contracting personnel solely for "informational purposes," including "advance notification of changes in acquisition or assistance regulations, reminders, procedures, and general information." *Id.* at 9–10. Although the cited provision contains mandatory language, a comparison of the language of the provision with the last two sentences of FAR 15.609(a)[51] suggests that the provision was intended to explicate the FAR requirement that a contracting officer should err on the side of establishing a broad competitive range. The CIB provision appears to provide the agency's gloss on the FAR requirement, rather than creating any binding obligation in its own right. This analysis is consistent with O'Hara's sworn statement. The court concludes that AID did not intend CIB 85–17 or its attachment to have the force and effect of law. Under the *Hamlet* test, therefore, CIB 85–17 is not a regulation entitled to the force and effect of law. *Cf. Lincoln Servs.*, 678 F.2d at 164 (holding that a published Department of Defense directive was entitled to the force and effect of law but that an agency turnkey manual was not). Consequently, violation of this guideline, even if shown, would not constitute arbitrary and capricious agency action. *See id.*

The FAR provisions cited by plaintiff, FAR 15.609(a) and (d), stated:

(a) The contracting officer shall determine which proposals are in the competitive range for the purpose of conducting written or oral discussion (see 15.610(b)). The competitive range shall be determined on the basis of cost or price and other factors that were stated in the solicitation and shall include all proposals that have a reasonable chance of being selected for award. When there is doubt as to whether a proposal is in the competitive range, the proposal should be included.

(d) If the contracting officer initially solicits unpriced technical proposals, they shall be evaluated to determine which are acceptable to the Government or could, after discussion, be made acceptable.... [A] competitive range determination must include cost or price proposals.

Plaintiff argues that Kenyon's decision finding Labat's second BAFO technically unacceptable and eliminating plaintiff from the competitive range constituted a competitive range determination, which should have been made in accordance with these provisions. The Government has conceded that Kenyon eliminated Labat from the competitive range without reviewing its cost proposal. Plaintiff argues, therefore, that a prejudicial violation of FAR 15.609(a) and (d) has been established. The court disagrees.

First, 15.609(d) was inapplicable to the BICSN procurement because AID did not use the two-step procedure—solicitation of unpriced technical proposals followed by the solicitation of price proposals from those offerors whose proposals are capable of being made technically acceptable—delineated in that provision. The agency solicited simultaneous submissions of technical and cost proposals. Hence, plaintiff's citation to 15.609(d) is inapposite. *See University of Dayton*, 85–1 C.P.D. ¶ 444 at 2 (1985).

Second, the relevant FAR provision at the time of this procurement was FAR 15.609(b), not 15.609(a). That provision stated: "If the contracting officer, after complying with 15.610(b) [the FAR provision requiring dis-

---

**51.** That provision stated: "The competitive range shall be determined on the basis of cost or price and other factors that were stated in the solicitation and shall include all proposals that have a reasonable chance of being selected for award. When there is doubt as to whether a proposal is in the competitive range, the proposal should be included." 48 C.F.R. § 15.609(a).

cussions with offerors in the competitive range], determines that a proposal no longer has a reasonable chance of being selected for contract award, it may no longer be considered for selection." This provision, by its terms, relates specifically to elimination of offerors from an established competitive range after the conduct of discussions, rather than to the establishment of a competitive range, which is the focus of FAR 15.609(a).

■■■■ One circumstance under which a proposal may be determined to have no further chance of award arises when it is determined to be technically unacceptable. A distinction exists here between consideration of initial proposals and BAFOs. An initial proposal may be excluded from the competitive range if it is technically unacceptable and would require major revisions to be made technically acceptable. *See W & D Ships Deck Works, Inc. v. United States,* 39 Fed.Cl. 638, 645 (1997); *Riveer Co.,* 98–2 C.P.D. ¶ 19 at 4 (1998). The corollary of this statement is that technically unacceptable proposals must generally be considered to be within the competitive range if capable of being made technically acceptable and if the proposal's cost or price term is competitive. *See Birch & Davis Int'l, Inc. v. Christopher,* 4 F.3d 970, 974 (Fed.Cir.1993) (" '[A] proposal must generally be considered to be within the competitive range unless it is so technically inferior or out of line as to price, as to render discussions meaningless.' ") (quoting *M.W. Kellogg Co. v. United States,* 10 Cl.Ct. 17, 23 (1986)).[52]

■■■■ The situation is different with respect to BAFOs, however. Because an agency generally may not reopen discussions after the submission of BAFOs, *see* FAR 15.611(c); *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1582 (Fed.Cir.1996), and because a technically unacceptable proposal cannot be

considered for award, *see Burroughs,* 617 F.2d at 596; *Spectrum Controls Sys.,* 97–1 C.P.D. ¶ 89 at 3–4 (1997), agencies must generally exclude a technically unacceptable BAFO from the competitive range, regardless of cost or price. *See Spectrum Controls,* 97–1 C.P.D. ¶ 89 at 4 (upholding elimination of revised proposal even though it was the lowest-priced proposal); *EMSA Ltd. Partnership,* 94–2 C.P.D. ¶ 43 at 6 (1994) (upholding elimination of low-priced BAFO); *Amstar Communications,* 94–1 C.P.D. ¶ 77 at 11 (1994) (same); *Randtron Sys.,* 90–1 C.P.D. ¶ 277 at 6 (1990) (same, in the context of a CPFF procurement). Consequently, "[o]nce an agency properly determines that a [best and final] proposal is technically unacceptable, the agency need not conduct further cost analysis or consider the cost of the unacceptable proposal since the proposal cannot be considered for award." *Eyring Research Inst., Inc.,* 86–1 C.P.D. ¶ 397 at 3 (1986); *see also Randtron,* 90–1 C.P.D. ¶ 277 at 6 ("[W]here a proposal is judged technically unacceptable, an agency is not obligated to consider a lower proposed cost."); *A.T. Kearney, Inc.,* 83–1 C.P.D. ¶ 190 at 8 (1983) (upholding exclusion of initial proposal from competitive range without review of protester's cost proposal).

■■■■ Kenyon, therefore, was not required to review plaintiff's cost proposal once he had determined, consistent with the recommendation of the TEC, that plaintiff's second best and final technical proposal was technically unacceptable.[53] Hence, as a matter of law, plaintiff cannot establish a violation of FAR 15.609.

#### 4. Past Performance Evaluation of Mr. Harmon

Plaintiff alleges that AID breached agency guidelines by failing to give Labat an oppor-

---

**52.** A number of GAO decisions have applied the tenet that "a technically unacceptable proposal cannot be considered for award" to the context of an agency's determination whether to establish, or which offerors should be included in, the *initial* competitive range, and have concluded that a technically unacceptable proposal is per se ineligible for inclusion in the competitive range. *STS Strategic Techs. & Sciences, Inc.,* 94–2 C.P.D. ¶ 194 at 5 (1994) (citing GAO decisions upholding exclusion of revised proposals or BA-

FOs); *see also TDA Joint Venture,* 92–1 C.P.D. ¶ 2 at 8 (1992) (relying on one GAO decision upholding the exclusion of a revised proposal); *Maschoff, Barr & Assocs.,* 88–1 C.P.D. ¶ 77 at 4 (1988) (same). The court disagrees with this view.

**53.** The GAO reached the same conclusion in the second protest. *See Labat,* 92–2 C.P.D. ¶ 244 at 9.

tunity to rebut negative past performance information considered by the TEC regarding Mr. Harmon. Plaintiff, however, has presented no evidence to support a finding that the agency violated any of its guidelines. It failed, either in its briefs or at oral argument, even to point the court to the guideline that AID allegedly breached.

Presumably, however, CIB 85–17 is the guideline upon which plaintiff relies. That guideline states in part: "The contracting officer shall not award a contract to an offeror/bidder where the deficiencies in past performance have been identified to the contracting officer, unless those deficiencies have been discussed with the offeror/bidder and addressed to the satisfaction of the contracting officer." CIB 85–17 § 1.b.(5), Pl.'s App. at 376. On its face, this guideline prohibits AID from awarding a contract to an offeror that has unresolved past performance deficiencies. It does not, however, require a contracting officer to discuss such deficiencies with offerors other than the proposed awardee. CIB 85–17, therefore, did not require Kenyon to seek a response from Labat regarding the agency's concerns with Harmon because Chemonics, not Labat, was selected as the awardee.[54]

Furthermore, as discussed *supra*, plaintiff failed to make any showing that CIB 85–17 constituted a binding agency regulation entitled to the force and effect of law, which is a necessary predicate to establishment of arbitrary and capricious agency action. *See Lincoln Servs.*, 678 F.2d at 164. For the foregoing reasons, as a matter of law, plaintiff cannot establish a violation of regulation on this issue.

### 5. Fringe Benefit Costs

Plaintiff alleges that the cost proposal of Chemonics' second BAFO contained fringe benefit costs, including "car allowances" for contractor and subcontractor personnel assigned to South Africa, that are unallowable under FAR 31.205–6.[55] It asserts that AID improperly awarded the contract to Chemonics despite this cost item. Defendant responds that Chemonics did not include a vehicle allowance in its cost proposal; instead, Chemonics "increased its employees salaries to make them more competitive with South African salaries that typically include a vehicle and fuel allowance." Def.'s Opp'n Br. at 25.

The court rejects defendant's assertion as inconsistent with the court's earlier finding that (1) Chemonics' cost proposal contained line items for vehicle allowances, and (2) Chemonics represented that such allowances were included in their local professionals' "benefits packages." Nevertheless, plaintiff's claim is unavailing because vehicle allowances are not per se unallowable. The FAR provides that the costs of fringe benefits, defined as "allowances and services provided by the contractor to its employees as compensation in addition to regular wages and salaries," are "allowable to the extent that they are reasonable and are required by law, employer-employee agreement, or an established policy of the contractor." 48 C.F.R. § 31.205–6(m)(1). Although the fringe benefits enumerated in that section do

---

54. Plaintiffs assertion that AID applied a "double standard" to its investigation of the past performances of Harmon and Hazlewood, is not availing. The TEC correctly incorporated their personal knowledge of proposed key personnel of the offerors into their evaluations. Several evaluators had direct knowledge of Harmon's past performance on AID contracts and appropriately downgraded his evaluation score based on their personal knowledge of his past performance. None of the evaluators had any knowledge of Hazlewood's past performance. The TEC treated both offerors equally; the fact that only plaintiff's candidate was downgraded on the basis of negative past performance does not reveal any improper treatment. Moreover, this court concludes *infra* that AID had no duty to investigate

Hazlewood's past performance absent some reason to believe that the representations in Hazlewood's biographical data sheet were inaccurate. *See infra* § C.4.c. Because the court holds that AID did not commit any prejudicial violations of law by accepting Chemonics' BAFO, *see infra* § C.4, AID was not required to seek another round of BAFOs and plaintiff thus cannot show that it had a substantial chance of award.

55. Plaintiff did not identify any allegedly impermissible fringe benefit costs other than vehicle allowances either in its complaint, in its briefs for summary judgment, or at oral argument. The court presumes, therefore, that plaintiff has waived these other aspects of this protest ground.

not include vehicle allowances, the provision states explicitly that the list is not exhaustive. Moreover, the next subsection, which states that "the portion of the cost of company-furnished automobiles that relates to personal use by employees (including transportation to and from work) is unallowable," by implication recognizes that non-personal vehicle expenses are allowable. *Id.* § 31.205–6(m)(2). There is no evidence that any of Chemonics' vehicle allowance costs relate to personal use. Nor has plaintiff presented any evidence to show that the vehicle allowance costs proposed by Chemonics are other than reasonable in quantum. Plaintiff, therefore, has presented no evidence to support its allegation of a violation of FAR 31.205–6.

Furthermore, even if these costs were unallowable, the appropriate response would have been for the agency to negotiate the removal of these costs from Chemonics' cost proposal. In that event, Chemonics' total cost would have been *lower* and thus more competitive with Labat's total cost. The alleged violation could not have harmed plaintiff.

### 6. Cost Realism Analysis

At oral argument, plaintiff for the first time alleged an additional regulatory violation—AID's failure to conduct a cost realism study of Chemonics' second BAFO prior to award. Plaintiff asserted that such analysis is mandatory in cost-reimbursement procurements. Following oral argument, plaintiff submitted a letter containing purported authority for this requirement. Plaintiff points to numerous GAO decisions that have stated this requirement, generally relying upon one of two FAR provisions—15.605(d) and 15.805–1(b).[56] *See Vitro Corp.,* 92–2 C.P.D.

¶ 202 at 6 (1992); *Science Applications Int'l Corp.,* 90–1 C.P.D. ¶ 517 at 4 (1990); *Advanced Tech. Sys.,* 85–1 C.P.D. ¶ 315 at 4 (1985).

■■■ As an initial matter, the court declines to accept the GAO's interpretation that either of those FAR provisions created any such mandatory requirement. FAR 15.805–1(b) addressed the use of cost or pricing data: "When cost or pricing data are required, the contracting officer shall make a cost analysis to evaluate the reasonableness of individual cost elements." The submission of cost or pricing data, however, was required prior to the "award of any negotiated contract . . . expected to exceed $100,000," [57] regardless of whether the procurement was contemplated on a cost-reimbursement or fixed-price basis. 48 C.F.R. § 15.804–2(a)(1)(i). Moreover, and more importantly, the GAO itself has recognized that the requirement for submission of cost or pricing data and the purported requirement for cost-realism analysis are "separate and distinct" and should not be confused. *KPMG Peat Marwick, LLP,* 95–2 C.P.D. ¶ 13 at 7, *aff'd on reconsideration, Advanced Research Projects Agency—Reconsideration,* 95–2 C.P.D. ¶ 26 (1995). The court agrees. It thus rejects the notion that FAR subpart 15.8 provided any authority for a mandatory cost-realism analysis in cost-reimbursement procurements, and declines to accept GAO decisions that have relied solely upon subpart 15.8 for this requirement. *See, e.g., Prospect Assocs. Ltd.,* 92–2 C.P.D. ¶ 258 at 7 (1992); *Science Applications,* 90–1 C.P.D. ¶ 517 at 4; *Electronic Warfare Integration Network,* 89–2 C.P.D. ¶ 356 at 3 (1989).

■■■ The other FAR provision cited by GAO decisions, FAR 15.605(d),[58] provides no greater support. That section states:

pricing data requirement, none of which are relevant here.

Subsequent to the events surrounding this protest, the threshold was raised to $500,000 for all procurements. *See* 60 Fed.Rec. 48,208, 48,214 (1995). This $500,000 threshold remains after the 1997 rewrite of FAR Part 15, albeit in a different FAR provision. *See* 48 C.F.R. § 15.403–4 (1998).

**56.** Subsequent to the events in this procurement, the FAR was amended to require the use of cost-realism analysis as part of evaluations in all cost-reimbursement procurements. *See* 62 Fed.Reg. *51,224, 51,237, 51,242 (1997)* (codified at 48 C.F.R. §§ 15.305(a)(1), 15.404–1(d)(2) (1998)). These amendments took effect on October 10, 1997. *See* 62 Fed.Reg. at 51,224.

**57.** The threshold was set at $500,000 for contracts awarded after December 5, 1990 by the Department of Defense, NASA, or the Coast Guard. *See id.* A related provision, FAR 15.804–3, provided exemptions from this cost or

**58.** This provision was redesignated as FAR 15.605(c) on March 31, 1995. *See* 60 Fed.Reg. 16,718, 16,719 (1995). It was replaced by a

In awarding a cost-reimbursement contract, *the cost proposal should not be controlling,* since advance estimates of cost may not be valid indicators of final actual costs. There is no requirement that cost-reimbursement contracts be awarded *on the basis of lowest proposed cost....* The award of cost-reimbursement contracts *primarily on the basis of estimated costs* may encourage the submission of unrealistically low estimates and increase the likelihood of cost overruns. The primary consideration should be which offeror can perform the contract in a manner most advantageous to the Government....

48 C.F.R. § 15.605(d) (emphasis added). The preceding FAR section provided helpful context:

While the lowest price or lowest total cost to the Government is properly the deciding factor in many source selections, in certain acquisitions the Government may select the source whose proposal offers the greatest value to the Government in terms of performance and other factors. This may be the case, for example, ... when cost-reimbursement contracting is anticipated.

*Id.* § 15.605(c). In addition, FAR 15.605(b) noted that "cost realism" "may" be included as an evaluation factor in solicitations.[59]

The clear import of 15.605(d) was that agencies should not award cost-reimbursement contracts to the lowest-cost offeror without regard to other evaluation factors. It may also be read as an indirect endorsement of cost-realism analysis in cost-reimbursement procurements. It went no fur-

ther, however, and cannot be construed reasonably as imposing a mandatory requirement for cost-realism analysis in all cost-reimbursement procurements, notwithstanding GAO pronouncements to the contrary.[60] *See, e.g., Porter/Novelli,* 95–1 C.P.D. ¶ 101 at 6 (1995) (citing 15.605(d) and subpart 15.8); *Clement Int'l Corp.,* 94–1 C.P.D. ¶ 228 at 8 (1994) (same); *Informatics Gen. Corp.,* 87–1 C.P.D. ¶ 105 at 9 (1987) (citing 15.605(d) and GAO precedents); *see also Day & Zimmermann Servs. v. United States,* 38 Fed.Cl. 591, 594 (1997).[61] The GAO has, on occasion, conceded, however, that 15.605(d) did not mandate cost-realism analysis. *See Advanced Research,* 95–2 C.P.D. ¶ 26 at 4.[62] The court agrees that 15.605(d) did not establish a mandatory obligation on agencies conducting cost-reimbursement procurements.

In *Advanced Research* and numerous other decisions, the GAO has emphasized that cost-realism analysis is required by GAO precedent. *See, e.g., Advanced Research,* 95–2 C.P.D. ¶ 26 at 4; *Tecom, Inc.,* 94–2 C.P.D. ¶ 212 at 3 (1994). Yet the decisions cited, when traced back to their ultimate source, rely on GAO pronouncements that contain language no stronger than FAR 15.605(d). For example, many GAO decisions have cited *CACI, Inc.–Federal,* 64 Comp.Gen. 71, 84–2 C.P.D. ¶ 542 (1984) or cases that derive from that decision. *See, e.g., Blue Cross Blue Shield of Texas,* 95–2 C.P.D. ¶ 248 at 10 (1995); *Tecom, Inc.,* 94–2 C.P.D. ¶ 212 at 3 (1994) (citing a GAO decision that traces back to *CACI* ); *Vitro,* 92–2 C.P.D. ¶ 202 at 6.[63] *CACI,* however, merely stated that "con-

provision mandating the use of cost-realism analysis when the FAR Part 15 rewrite took effect on October 10, 1997. *See supra* note 44.

**59.** This is the only occasion that the term "cost realism" is used in the 1991 edition of the FAR.

**60.** A number of GAO decisions have cited FAR 15.609(d) as authority for the cost-realism analysis requirement. *See, e.g., McDonnell Douglas Corp.,* 95–2 C.P.D. ¶ 51 at 25 (1995); *ES, Inc.,* 95–1 C.P.D. ¶ 168 at 8 n. 3 (1995). Because FAR 15.609(d) relates to competitive range determinations in two-step negotiated procurements, *see supra* § A.3, the court presumes that these decisions intended to cite FAR 15.605(d).

**61.** One other court decision has held that cost-realism analysis is obligatory, without citing any

authority. *See Halifax Technical Servs., Inc. v. United States,* 848 F.Supp. 240, 242 (D.D.C. 1994).

**62.** The GAO also acknowledged that DFARS 215.805–70(a)—which stated that a contracting officer "[s]hould perform a cost realism analysis when ... a cost-reimbursement contract is anticipated," 48 C.F.R. § 215.805–70(a) (1993)—did not explicitly create a mandatory requirement. *See Advanced Research,* 95–2 C.P.D. ¶ 26 at 3.

**63.** *Advanced Research,* which squarely addressed and rejected a protester's contention the FAR does not require cost-realism analysis, itself cited *Tecom* (which relies on *CACI* ), *CACI,* and *Grey Advertising, Inc.,* 55 Comp.Gen. 1111, 76–1 C.P.D. ¶ 325 (1976) for authority. *See Advanced*

sidering evaluated costs instead of proposed costs provides a sounder basis for determining the most advantageous proposal." *CACI*, 84–2 C.P.D. ¶ 542 at 5.

Similarly, numerous GAO decisions (and the plaintiff here) have cited *Advanced Technology*, 85–1 C.P.D. ¶ 315, either directly or indirectly. *See, e.g., PAI, Inc.*, 67 Comp.Gen. 516, 520, 88–2 C.P.D. ¶ 36 at 5 (1988) (citing a GAO decision that can be traced back to *Advanced Technology* ); *Informatics*, 87–1 C.P.D. ¶ 105 at 9. Yet *Advanced Technology* merely stated that "we have held it improper to award a cost-reimbursement contract *on the basis that the costs proposed are reasonable, per se, merely because they are low when compared to other offers*, without an appropriate analysis adequately measuring the realism of such *low costs*." *Advanced Technology*, 85–1 C.P.D. ¶ 315 at 4 (emphasis added). That language, similar to the language of FAR 15.605(d), would preclude the award of a cost-reimbursement contract solely on the basis of cost, absent some form of cost-realism analysis, but goes no further. It cannot be construed as precluding the award of a cost-reimbursement contract without a cost-realism assessment in all circumstances.

The court agrees with the limited holdings of *CACI* and *Advanced Technology*. Cost-realism analysis would have been a sound procedure for agencies to follow when evaluating offers for cost-reimbursement contracts, and agencies should have conducted such analysis.[64] *See CACI*, 84–2 C.P.D. ¶ 542 at 5. Moreover, cost-realism analysis would have been especially appropriate where an agency proposed to award a cost-reimburse-

ment contract on the basis of lowest proposed cost, or where an agency had stated that cost was a substantial factor in the award decision and the proposed awardee was the low-cost offeror. *See* FAR 15.605(d); *Advanced Technology*, 85–1 C.P.D. ¶ 315 at 4. But the court declines to accept subsequent GAO decisions holding that an agency was *required* to perform cost-realism analysis of all offers submitted for cost-reimbursement contracts.[65] The court holds, therefore, that the FAR did not mandate cost-realism analysis and plaintiff cannot, as a matter of law, establish a violation of the FAR on this issue.

■ Even assuming that a cost-realism analysis was required, plaintiff has failed to make any showing that it was prejudiced by AID's violation of this requirement. Contrary to plaintiff's assertions in its briefs, the law in this circuit is that a plaintiff must show that it was prejudiced by a violation of procurement law in order to prevail. *See Southfork*, 141 F.3d at 1134 (citing *Keco II*, 492 F.2d at 1204); *Statistica*, 102 F.3d at 1581. "To establish competitive prejudice, a protester must demonstrate that but for the alleged error, there was a 'substantial chance that [it] would receive an award—that it was within the zone of active consideration.' " *Statistica*, 102 F.3d at 1581 (quoting *CACI, Inc.– Federal*, 719 F.2d at 1574–75 (quoting *Morgan Business Assocs. v. United States*, 223 Ct.Cl. 325, 619 F.2d 892, 896 (Ct.Cl.1980))). This requirement has never been limited to appeals from decisions of executive tribunals such as the General Services Board of Contract Appeals or the GAO, as plaintiff con-

---

*Research*, 95–2 C.P.D. ¶ 26 at 4. The first two decisions do not provide the support claimed, because *CACI* held only that cost-realism analysis provides a "sounder basis" for award. *See text infra*. The latter decision did not include any statement that cost-realism analysis is mandatory. Moreover, in all three of these cases, the RFP included a provision stating that cost proposals would be evaluated for cost realism.

**64.** Since October 10, 1997, two FAR provisions have mandated the use of cost-realism analysis in cost-reimbursement procurements. *See supra* note 56. Prior to the Part 15 rewrite, however, agencies were permitted by the FAR to include a provision in their solicitations stating that proposals would be evaluated for cost realism. *See*

48 C.F.R. § 15.605(b). In fact, agencies frequently included such a provision. *See, e.g., Analytical & Research Technology*, 39 Fed.Cl. at 54 n. 19; *Day & Zimmermann*, 38 Fed.Cl. at 594; *KPMG*, 95–2 C.P.D. ¶ 13 at 4; *Tecom*, 94–2 C.P.D. ¶ 1212 at 2; *Grey Advertising*, 55 Comp. Gen. at 1123; 76–1 C.P.D. ¶ 325 at 14.

**65.** The court also notes that the "holdings" of many of these decisions regarding mandatory cost-realism analysis are in fact dicta because the solicitations at issue included a requirement that proposals would be evaluated for cost realism, as authorized by FAR 15.605(b). *See KPMG*, 95–2 C.P.D. ¶ 13 at 4; *Tecom*, 94–2 C.P.D. ¶ 1212 at 2; *see also Day & Zimmermann*, 38 Fed.Cl. at 594.

tests. In fact, the standard is derived from *Keco II,* a case in which the plaintiff filed a post-award bid protest to recover bid preparation costs before the predecessor of this court.[66] *See Southfork,* 141 F.3d at 1134 (citing *Keco II,* 492 F.2d at 1201).

To establish prejudice, plaintiff is required to present evidence that it had a "substantial chance" or "reasonable likelihood" of receiving award absent the alleged violation of procurement law, i.e., it was within the zone of active consideration. *See Statistica,* 102 F.3d at 1581. Because the court holds *infra* that AID properly determined plaintiff's second BAFO to be technically unacceptable and thus eliminated it from the competitive range, plaintiff cannot show that it was prejudiced by AID's failure to conduct a cost-realism analysis.

### B. *Technical Unacceptability Determination*

Plaintiff asserts that AID's determination that its second BAFO was technically unacceptable lacked any reasonable basis and constituted an abuse of discretion by the contracting officer.[67] This contention requires the court to review AID's evaluation of the technical proposal Labat submitted as part of its second BAFO.

■■■■ At the outset, the court notes that contracting officers are vested with wide discretion with regard to the evaluation of bids. *See Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d 955, 959 (Fed.Cir.1993); *Hydro Eng'g, Inc. v. United States,* 37 Fed.Cl. 448, 464 (1997), *CACI,* 13 Cl.Ct. at 725. Contracting officers are also entitled to "broad discretion ... to determine whether a proposal is technically acceptable." *Continental Business Enters. v. United States,* 196 Ct.Cl.

627, 452 F.2d 1016, 1021 (Ct.Cl.1971); *Hydro Eng'g,* 37 Fed.Cl. at 464. Reflecting this broad discretion, "plaintiff has an unusually heavy burden of proof in showing that the [technically unacceptability] determination ... was arbitrary and capricious." *Continental,* 452 F.2d at 1021. Plaintiff's burden is to demonstrate that the agency's determination lacked a reasonable basis. *See id.; see also Amstar Communications,* 94–1 C.P.D. ¶ 77 at 4–5 (stating that GAO review "is limited to determining whether the evaluation was reasonable and consistent with the stated evaluation criteria"). Moreover, the court " 'should stay its hand even though it might, as an original proposition, have reached a different conclusion.' " *Continental,* 452 F.2d at 1022 (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971)); *see also CACI,* 13 Cl.Ct. at 735.

The procedures governing the evaluation of technical proposals are set forth in the RFP and the AID Acquisition Regulation ("AIDAR"), which governs all AID procurements. Section II.B of the RFP stated that the TEC would be responsible for evaluating proposals in accordance with the AIDAR. In turn, the AIDAR requires a TEC to "evaluate all proposals pursuant to the evaluation criteria established and set forth in the solicitation" and to report the results to the contracting officer.[68] 48 C.F.R. § 715.608–70(b)(1)(i), (ii). The TEC is thus responsible for determining the technical acceptability vel non of submitted proposals and BAFOs. The contracting officer is responsible for "reviewing the written evaluation results to determine that they are adequate and complete." *Id.* § 715.608–70(b)(1)(iii).

---

**66.** Plaintiff's assertion that *Keco II* and *Statistica* relate two different standards is thus erroneous. *Statistica, Southfork,* and other recent Federal Circuit decisions refine the *Keco II* standard, rather than establish a prejudice test for cases in which plaintiffs do not seek recovery of bid preparation costs.

**67.** This argument is also offered as support for plaintiff's bad faith claim: plaintiff asserts that the determination was made as the final step in a pre-determined strategy to create a sham competitive procurement. *See infra* § C.

**68.** The FAR provides a list of four items that a "technical official" must follow in documenting the technical evaluation: (1) the basis for the evaluation; (2) an analysis of each proposal assessing the ability of each offeror to meet the technical requirements; (3) a quantitative ranking of each technical proposal in relation to the maximum possible score; and (4) a summary of findings. *See* 48 C.F.R. § 15.608(a)(2). Plaintiff has not raised any allegation that the TEC failed to comply with these procedural requirements.

Plaintiff's assertion requires this court to conduct a two-step review. We must determine the reasonableness of: (1) the TEC's evaluation of plaintiff's second BAFO and its recommendation to Kenyon; and (2) Kenyon's review of the TEC's recommendation. The first step requires the court to scrutinize the evaluators' scoring sheets and Neifert's April 2, 1992 memo, which presented Kenyon with the results of the TEC's evaluation and the committee's conclusion that Labat's BAFO "no longer has a reasonable chance of being made acceptable for award." Pl.'s App. at 398.

The TEC identified numerous deficiencies with regard to both Labat's technical approach and its proposed personnel, and the court has recounted them in some detail.[69] The former included a lack of understanding of the objective of the BICSN project, an ill-conceived organizational structure, an unexplained division of the BECF, and the lack of experience of JHI. With regard to Labat's personnel, the TEC found Harmon to be lacking in the leadership skills necessary to successfully manage the project and stated that Boyd's "lack of overseas experience would contribute to an unacceptable level of performance." *Id.* Three other members of Labat's team of seven key personnel were also criticized for their inexperience or failure to coherently express Labat's approach.

In light of plaintiff's failure to raise objections to any of these noted deficiencies, the court can only conclude that the memo accurately reflected deficiencies in Labat's technical proposal.[70] The court finds that these concerns—particularly the concerns regarding the failure to convey an understanding of the objective of the BICSN project, the flat organizational structure, and Harmon's lack of leadership skills—justified the committee's conclusion that Labat's proposal "would require major modifications and . . . no longer has a reasonable chance of award." *Id.* We

conclude, therefore, that the TEC's assessment of technical unacceptability was reasonable.

The second step requires the court to consider Kenyon's review of the TEC's evaluation and recommendation. The record shows that Kenyon reviewed Labat's BAFO and the April 2 memo and found the committee's analysis to be reasonable. He also determined that the TEC had evaluated the proposals according to the criteria stated in the RFP. He then concluded that Labat's BAFO should be excluded from the competitive range on the grounds of its technical unacceptability.

Plaintiff does not challenge any of these actions. Instead, it contends that Kenyon should have considered the offerors' cost proposals prior to making any determination to exclude plaintiff's BAFO from the competitive range. This argument fails to recognize, however, the consequences of a technical unacceptability determination. As discussed *supra*, once an offeror's best and final technical proposal is determined to be technically unacceptable, an agency may eliminate the offeror's BAFO from the competitive range without reviewing its cost proposal. *See Eyring Research*, 86–1 C.P.D. ¶ 397 at 3; *Randtron*, 90–1 C.P.D. ¶ 277 at 6. Cost is no longer a consideration.

Plaintiff also argues that AID's conduct of discussions throughout this entire procurement process was inconsistent with the final determination of technical unacceptability. Plaintiff claims that the inclusion of its initial proposal in the competitive range demonstrates that the proposal was technically acceptable. It also contends that its first BAFO was found to be technically acceptable by the TEC. Consequently, plaintiff argues, AID could not rationally then determine that

---

69. *See supra* text accompanying notes 27–29.

70. The court is satisfied that the April 2 memo accurately reflected the consensus of the TEC. Although Motshwane's evaluation was considerably more favorable to plaintiff than those of the other evaluators—Motshwane gave plaintiff's BAFO a score of 82, whereas the next highest score was 61—that fact alone does not cast doubt

upon the committee's finding of technical unacceptability. *See Color Ad Signs & Displays*, 91–1 C.P.D. ¶ 154 at 5 (1995). It demonstrates the existence of disparate subjective judgments of Labat's technical proposal. Nevertheless, three of the TEC members were in agreement that the proposal was technically unacceptable, and the memo accurately represented that majority view.

plaintiff's second BAFO was unacceptable at the final stage of the procurement.[71]

██ Plaintiff's argument fails to acknowledge that a second BAFO may reasonably be rated higher *or lower* than an offeror's initial proposal or its prior BAFO. The fact that Labat's second BAFO was rated lower than either of its previous proposals does not ipso facto reveal a deficiency in the agency's final evaluation.[72] The second BAFO differed in respect to its technical approach and its key personnel from both prior proposals. As a result of these changes, AID could reasonably upgrade or downgrade Labat's technical score. The GAO has repeatedly held that a BAFO may be excluded from the competitive range on grounds of technical unacceptability, notwithstanding the fact that, a priori, the offeror's initial proposal was determined to be within the competitive range. *See, e.g., Labat,* 92–2 C.P.D. ¶ 244 at 9; *Loral Terra-Com—Request for Costs,* 87–2 C.P.D. ¶ 250 at 3–4 (1987). Moreover, the GAO has upheld agency decisions that rejected a BAFO as technically unacceptable after the protester's initial proposal had been determined to be acceptable. *See, e.g., Patent Scaffolding Co.,* 93–1 C.P.D. ¶ 158 (1993); *Randtron,* 90–1 C.P.D. ¶ 277.

The court has already commented on the deficiencies that AID identified in Labat's second BAFO. These included deficiencies that were introduced for the first time in the second BAFO. For example, TEC found plaintiff's revised organizational structure and its proposed division of responsibility for the BECF to be unsatisfactory. The TEC also expressed concern with two new candidates on Labat's team, Van Rooyen and Christie. The reduction in technical score

from plaintiff's initial proposal to its second BAFO does not appear to be irrational, and does not constitute evidence to defeat defendant's motion for summary judgment on this issue.

Finally, plaintiff's brief also alleges that the technical unacceptability determination reveals the deficiency in the agency's conduct of discussions with Labat. Plaintiff argues that AID's discussion questions did not alert it that the agency's concerns rose to the level of the deficiencies. The court has addressed this argument *supra* and concluded that the discussions were meaningful and provided plaintiff with fair warning that deficiencies existed in its first BAFO which needed to be addressed in its second BAFO. Moreover, the court agrees with the GAO that AID was under no obligation to reopen discussions with Labat to allow it the opportunity to cure deficiencies that had not been corrected in the second BAFO, or that were first introduced in the second BAFO. *See Labat,* 92–2 C.P.D. ¶ 244 at 11; *see also Intertec Aviation,* 91–1 C.P.D. ¶ 348 at 3 (1991); *Loral TerraCom,* 87–2 C.P.D. ¶ 250 at 3.

In sum, plaintiff has failed to make any showing sufficient to defeat the Government's motion for summary judgment on count II.

## C. *Bad Faith*

In count I of its complaint, plaintiff alleges that AID acted with bad faith in the conduct of this procurement. The central theme of its complaint and briefs is that AID determined prior to its selection of the initial competitive range that it would make a disguised, sole source[73] award of the contract to

---

**71.** At oral argument, plaintiff repeatedly cited *Eastern Marine, Inc. v. United States,* 765 F.2d 158 (Fed.Cir.1985), as authority on this point. Plaintiff's reliance upon *Eastern Marine* is misplaced. The Federal Circuit's decision was released as an unpublished opinion; consequently, it may not be "employed or cited as precedent." Fed.Cir.R. 47.6(b); *see also New England Elec. Sys. v. United States,* 32 Fed.Cl. 636, 644 n. 5 (1995).

**72.** The court also notes that plaintiff's direct comparison of the scores awarded to its first and second BAFOs is uninformative because the two BAFOs were evaluated based on different evalua-

tion criteria. Accordingly, the scores cannot be meaningfully compared.

**73.** A sole source procurement is a noncompetitive procurement, i.e., a procurement under which the Government does not seek or consider bids or offers from other than the designated source. *See Ameron, Inc. v. United States Army Corps of Eng'rs,* 809 F.2d 979, 983 (3d Cir. 1986), *cert. dismissed,* 488 U.S. 918, 109 S.Ct. 297, 102 L.Ed.2d 264 (1988); 41 U.S.C. § 253(c) (1994). Under the Competition in Contracting Act of 1984 ("CICA"), Pub.L. No. 98–369, Div. B, Title VII, 98 Stat. 1175, agencies may avoid the statutory requirement for full and

Chemonics, regardless of the technical acceptability of plaintiff's proposals. Plaintiff asserts, therefore, that the agency's initial creation of a competitive range, and the subsequent request for BAFOs, discussions, evaluation of BAFOs, and exclusion of Labat's second BAFO from the competitive range, were merely elements of an elaborate charade to create the appearance that AID was conducting a legitimate, competitive procurement. Plaintiff contends that the TEC, following Kenyon's directions, recommended including plaintiff's proposal in the initial competitive range, even though the genuine consensus of the committee was to recommend a competitive range with only one offeror, Chemonics. Labat was thus included in the competitive range, through two rounds of discussions, merely to create the illusion of competition. Then, at the eleventh hour—having successfully completed the illusion—the TEC evaluated Labat's second BAFO as technically unacceptable (consistent with the committee's true belief).

To support this count, plaintiff has alleged numerous actions by AID that demonstrate bad faith conduct:[74] (1) including Labat's proposal in the initial competitive range, even though the agency had pre-determined that it would award the contract to Chemonics; (2) engaging in actions held to be violations of procurement regulations by the GAO in the first protest; (3) excluding plaintiff's BAFO from the second competitive range in "retribution" for Labat's GAO protest; (4) accepting Chemonics' second BAFO despite the fact that it contained numerous deficiencies; (5) paying Chemonics' invoices for periods during which the contract was suspended; (6) failing to correct GAO's misapprehension that AID had conducted a cost-realism study to justify the contract award to Chemonics; and (7) ratifying the

original contract award at a CPFF in excess of the CPFF proposed in Chemonics' second BAFO.[75]

■ Any analysis of plaintiff's bad faith claim "must begin with the presumption that public officials act 'conscientiously in the discharge of their duties.'" *Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 543 F.2d 1298, 1301 (Ct.Cl.1976) (quoting *Librach v. United States*, 147 Ct.Cl. 605, 612 (1959)), *cert. denied*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977); *see also Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d 1578, 1581 (Fed. Cir.1995) ("We assume the government acts in good faith when contracting."). Accordingly, to overcome this presumption, plaintiff's ultimate burden of proof on this claim has been described by the Federal Circuit, and its predecessor the Court of Claims, as "very weighty," *Krygoski Constr. Co. v. United States*, 94 F.3d 1537, 1541 (Fed.Cir. 1996), *cert. denied*, 520 U.S. 1210, 117 S.Ct. 1691, 137 L.Ed.2d 819 (1997), or "'well-nigh irrefragable.'" *Kalvar*, 543 F.2d at 1301 (quoting *Knotts v. United States*, 121 F.Supp. 630, 631, 128 Ct.Cl. 489, 492 (1954)). Plaintiff is thus required to present evidence that AID acted with "specific intent to injure the plaintiff," or was "'motivated alone by malice.'" *Torncello v. United States*, 231 Ct.Cl. 20, 681 F.2d 756, 770 (Ct.Cl.1982) (quoting *Gadsden v. United States*, 78 F.Supp. 126, 127, 111 Ct.Cl. 487, 489–90 (1948)).

Unquestionably, if plaintiff's allegations are true, AID's manipulation of the BICSN procurement would constitute an act of bad faith by the government and the plaintiff would be entitled to recover bid proposal costs. *See Keco II*, 492 F.2d at 1204–05 (stating that "it is enough for recovery if an adequate showing is made that the Government acted in bad faith, e.g., by predetermining the awardee or by harboring a prejudice

---

open competition and the use of competitive procedures only if one of six exemptions applies. *See* 41 U.S.C. § 253(c). One of these is the sole source exemption, which may be invoked if the desired product or services are available from only one responsible source and no other product or services would satisfy the agency's needs. *See id.* § 253(c)(1).

**74.** The court derives these seven bases for plaintiff's allegation of bad faith from the more numerous, but overlapping, bases presented in plaintiff's complaint and the briefs supporting its partial motion for summary judgment.

**75.** Plaintiff also cited the alleged violations of procurement regulations discussed earlier in this opinion. *See supra* § A. Because the court has determined that AID did not violate these regulations, the alleged violations provide no support for the plaintiff's allegation of bad faith.

against the plaintiff"); *Heyer Products,* 140 F.Supp. at 413.

In the present context of cross motions for summary judgment, plaintiff is required only to "submit sufficient evidence upon which a reasonable trier of fact could find in its favor" under this very weighty burden of proof. *A–Transport Northwest Co. v. United States,* 36 F.3d 1576, 1585 (Fed.Cir.1994). The court finds that plaintiff has submitted sufficient evidence to defeat the defendant's motion with respect to only two of the seven bases stated above.[76] The court will consider each of plaintiff's alleged bases in turn.

### 1. Inclusion of Labat's Proposal in the Initial Competitive Range

Plaintiff contends that the TEC included its proposal in the initial competitive range in response to a request by Kenyon, and despite the consensus view of the committee members that the proposal should have been excluded. To support this serious allegation, plaintiff points only to the testimony of Daniel Rathbun, one of the members of both TECs. In particular, plaintiff relies on several of Rathbun's comments during his September 1996 deposition:

> I personally felt that there was only one firm that should be in the competitive rank based on the proposals that I read, and that firm was Chemonics. There was some concern on the part of other members of the committee that it would be unacceptable to the regional contracting officer to have only one firm in the competitive range....
>
> ....
>
> This is speculation on my part, but I think there was a sense on the part of some other members [probably Mangera and Himelfarb] that ... you couldn't have the competition if you only had one firm.

Rathbun Dep. of Sept. 24, 1996 at 15–18, Pl.'s App. at 56.

Plaintiff asserts that these responses demonstrate that a majority of the TEC—presumably Rathbun, Mangera, and Himelfarb—thought that only Chemonics' proposal should be included in the competitive range,

yet they sent Kenyon a recommendation to include both Chemonics and Labat. This contention rests upon the following construction of Rathbun's recollection: Mangera and Himelfarb believed that Labat's proposal should be excluded from the competitive range; nevertheless, because they were concerned that Kenyon wanted to have more than one proposal in the competitive range, they voted with the two other members of the TEC (Addleton and Creamer) to include Labat's proposal. It also rests on the accuracy of Rathbun's admitted "speculation."

Putting aside the speculative nature of the second comment, this is a strained reading of Rathbun's statements. Clearly, Rathbun himself believed Labat's proposal deserved to be excluded, and this is reflected in the low score of 58 that he gave to the proposal. But the concern expressed by Mangera and Himelfarb can more reasonably be construed as proper regard for the presumption—stated in the FAR and AID's guidelines—that a marginal proposal should be included with the competitive range. FAR 15.609(a) stated that the competitive range "shall include all proposals that have a reasonable chance of being selected for award. When there is doubt as to whether a proposal is in the competitive range, the proposal should be included." 48 C.F.R. § 15.609(a). AID's procurement instructions similarly provide that a proposal "is in the competitive range unless it is so technically inferior or out of line with regard to price that meaningful negotiations are precluded, or, that there is no possibility that it can be improved to the point where it becomes acceptable." Attach. to CIB 85–17 at 4, Pl.'s App. at 380. This presumption in favor of a broad initial competitive range derives from the statutory requirement for "full and open competition." 41 U.S.C. § 253(a)(1)(A); *see Birch & Davis,* 4 F.3d at 973–74.

This interpretation is supported by the declarations of four of the TEC members. Rathbun's declarations directly refute plaintiff's interpretation of his deposition comments: he denied the existence of any covert plan to create an artificial competitive range,

---

**76.** As discussed *infra,* there are three issues of

concern to the court within these two bases.

and stated that the higher scores given by the other evaluators to Labat's proposal reflected their genuine support for the merits of the proposal. Himelfarb admitted that there was some discussion within the TEC regarding the size of the competitive range, but that the concerns expressed related to the 8.4–point difference between the average scores of each proposal. Mangera's declaration rejected any assertion that he ever held the position that Labat's proposal should have been excluded from the competitive range; instead, he had believed that Labat's technical score justified the conclusion that it had a reasonable chance of award. He expressly refuted any suggestion that he considered Kenyon's alleged preferences for the size of the competitive range. Addleton stated that he concurred with the consensus of the committee that "Labat's proposal was sufficiently strong to make the 'second cut.'" Addleton Decl. at 1, Def.'s Ad. at 7.[77]

The individual evaluation scores provide further support. After reviewing the initial proposals, two evaluators—Himelfarb and Addleton—rated Labat's proposal technically superior to that of Chemonics, and Creamer rated the two proposals almost equally. The evaluation scores reveal, therefore, that a majority of the TEC members believed that Labat's proposal deserved to be included within the competitive range.[78]

### 2. Engagement in Conduct Held to Be Improper by the GAO

Plaintiff alleges that the Government's bad faith is evidenced by the GAO's findings of procurement violations in the first protest. The implication is that AID's violations in the first procurement round were manifestations of the agency's bad faith effort to deprive plaintiff's first BAFO of honest and fair consideration; hence, this bad faith also permeated the second round.

Plaintiff's insinuation that these missteps represent the tip of an iceberg of agency misconduct lacks any supporting evidence.

There is no evidence in the record that the agency's procurement violations—AID's deviation from the evaluation criteria in the RFP and its failure to amend the RFP or reopen discussions—were motivated by bad faith. Plaintiff did not even allege bad faith in its protest to GAO.

Moreover, the GAO has rejected a similar allegation to the one plaintiff raises here. In *Radiation Systems, Inc.*, 87–1 C.P.D. ¶ 129 (1987), the Navy canceled a contract award and requested a second round of BAFOs after the protester (RSI) filed a protest at GAO. The Navy then re-awarded the contract to the company it had selected in the first procurement. RSI challenged the second award, alleging inter alia that the Navy was biased toward the awardee and was attempting to conduct a disguised sole source procurement. It pointed to the agency's corrective action in response to its prior protest as support for its claim. The GAO held:

> Whatever deficiency may have existed in this procurement in the past, the Navy subsequently took some corrective action. Accordingly, we do not agree with RSI that the protest history of this solicitation proves any improper action by the Navy with regard to RSI's instant protest, nor that this procurement was actually a sole-source procurement in the guise of a competitive solicitation.

*Id.* at 5.

We agree with this rationale. AID corrected the errors identified by GAO in the first protest, and the court has found no prejudicial violations of procurement regulations in the present action. The success of Labat's first GAO protest provides no support for its claim of bad faith here.

### 3. Retribution by AID

Plaintiff alleges that AID excluded its second BAFO from the competitive range in retribution for its protest to the GAO. If

---

77. In addition, Kenyon's declaration rejected plaintiff's claim that he had any preconceived preference with regard to the size of the competitive range.

78. Plaintiff expressly declined to challenge any of the individual evaluation scores during this protest. It contends that its proposal should have been excluded from the competitive range notwithstanding the 77.6 score given to the proposal.

true, such action would constitute an act of bad faith by the Government and the plaintiff would be entitled to recover bid proposal costs. *See Heyer Products,* 140 F.Supp. at 410, 412–13 (holding that a plaintiff may recover bid preparation costs if it can show that the Government awarded a contract to another bidder rather than the plaintiff in retaliation for the plaintiff's testimony before a Senate hearing).

Plaintiff, however, has failed to present *any* evidence to support this allegation. The court has held *infra* that AID's determination that plaintiff's second BAFO was technically unacceptable was reasonable, and that the agency properly excluded the BAFO without reviewing the cost proposal. Plaintiff's retribution allegation must be rejected.

### 4. Acceptance of Chemonics' Allegedly Non–Responsive BAFO

According to plaintiff, AID improperly approved award to Chemonics despite a "host of problems, deficiencies and improprieties" in Chemonics' BAFO that rendered it non-responsive. Pl.'s Br. of May 15, 1997 at 15. These alleged deficiencies include: (a) proposing a contract performance period of 53 months rather than the five-year period allegedly specified in the RFP; (b) funding information management personnel through the TAF; (c) misrepresentations regarding Hazlewood's business experience; and (d) misrepresentations regarding Molebatsi's commitment to work for Chemonics. Defendant is correct in stating that plaintiff cannot establish prejudice from any procurement violations relating to *Chemonics* BAFO, even if proven, because Labat's second BAFO was properly eliminated from the competitive range. Plaintiff cannot show that it had a substantial chance of award absent any violations relating to Chemonics' BAFO because none of these alleged violations would impact the technical unacceptability of Labat's BAFO. *See CACI,* 13 Cl.Ct. at 728–29; *Tero Tek Int'l, Inc.,* 88–1 C.P.D. ¶ 132 at 4 (1988); *Metric Sys. Corp.,* 83–2 C.P.D. ¶ 394 at 10 (1983). Nevertheless, the court will consider these allegations because, if proven, they may provide some evidentiary support for plaintiff's bad faith claim.

### a. Contract Performance Period

Plaintiff contends that AID demonstrated bad faith by accepting Chemonics' second BAFO even though it failed to comply with the five-year performance period specified in the RFP. It asserts that Chemonics' submission of a cost proposal based on a period of less than five years "suggests the level of collusion between Chemonics and the [contracting officer]." Pl.'s Reply Br. at 20. Although plaintiff is correct in stating that Chemonics' cost proposal was based on a 53–month contract term, it is not correct in asserting that the RFP unambiguously required a five-year period.

When issued by AID, the RFP was unambiguous: it required offerors to base proposals on "a period of five years, from approximately October 1991 to September 1996." RFP § I.G, Pl.'s App. at 190. By February 24, 1992, however, when discussions were reopened with Chemonics and Labat, the October 1991 commencement date had already passed. The February 24 amendment to the solicitation did not amend section I.G of the RFP. Hence, the offerors were required to submit BAFOs in March 1992 for a five-year contract period that had begun six months earlier. In the context of the second competition, the term "five years" was incompatible with the beginning and ending dates set in the RFP.

Chemonics and Labat interpreted section I.G differently. Chemonics assumed that AID still intended the contract to terminate in September 1996, per the solicitation, and that contract performance would begin on May 1, 1992, approximately six weeks after receipt of BAFOs. Accordingly, it based its cost proposal on a 53–month performance period. Labat, however, assumed that the contract would run for five years and the dates in the RFP were no longer applicable. Consequently, it submitted a cost proposal based on a five-year term.

Kenyon reviewed Chemonics' cost proposal and determined that it was consistent with the RFP. He did not review Labat's cost proposal because he had decided to adopt the TEC's recommendation that Labat's technical proposal was technically unacceptable. It is not clear, therefore, whether Kenyon be-

came aware, prior to the second contract award, of Labat's alternative interpretation of the RFP.

The court finds that, in the context of the second competition, the language of section I.G of the solicitation was ambiguous. Moreover, Chemonics' interpretation of the provision was a reasonable one. It was not unreasonable, therefore, for Kenyon to consider Chemonics' cost proposal an adequate response to the solicitation. Consequently, the court concludes that Kenyon's acceptance of Chemonics' BAFO provides no support for count I of plaintiff's complaint.

### b. Cost–Shifting to the TAF

Plaintiff asserts that Chemonics improperly funded short-term information management personnel costs through the TAF, thereby reducing its total proposed cost by approximately $200,000.[79] Plaintiff argues that AID's acceptance of Chemonics' BAFO thus was evidence of the agency's bad faith. The defendant acknowledges that Chemonics' proposal incorporated this cost-shifting but argues that such action, although not required by the RFP, was not inconsistent with it either.

Defendant's argument diverges from the position taken by AID in Labat's second GAO protest. In that proceeding, AID filed an agency report conceding that Chemonics' cost-shifting deviated from the RFP and that the agency accordingly should have amended the RFP. Despite the agency's concession, GAO determined that "[o]ur review of the RFP show that such usage of the TAF funds ... was appropriate for the information evaluation and monitoring services to be provided, although this use of TAF funds may not have been originally contemplated by AID." *Labat,* 92–2 C.P.D. ¶ 244 at 7 n. 1.

Pursuant to statute, the agency report is part of the record before this court. *See* 31 U.S.C. § 3556 (1994). Consequently, the concession is part of the record and the government is estopped from arguing here

that Chemonics' BAFO complied with the terms of the RFP. Moreover, the conduct acknowledged by the agency—its failure to amend the RFP after accepting Chemonics' BAFO—violated FAR 15.606(c), which provided that "[i]f the proposal considered to be most advantageous to the Government ... involves a departure from the stated requirements, the contracting officer shall provide all offerors an opportunity to submit new or amended proposals on the basis of the revised requirements." 48 C.F.R. § 15.606(c). Nevertheless, AID's actions do not establish a prejudicial violation of procurement law, nor do they support plaintiff's bad faith claim.

Plaintiff cannot show prejudice for two reasons. First, the GAO found that plaintiff apparently employed cost-shifting in its own BAFO by proposing to use the TAF to finance "similar guidance, monitoring and information gathering services." *Labat,* 92–2 C.P.D. ¶ 244 at 7 n. 1. Based on this finding, GAO held that plaintiff had not been prejudiced by the lack of an RFP amendment. *See id.* Although the court cannot verify GAO's characterization of Labat's proposed use of TAF resources because Labat's cost proposal is not before the court, we are willing to accept GAO's representation of the technicalities of the cost proposal. Plaintiff cannot show prejudice, therefore, because both offerors were permitted to submit proposals that deviated from the RFP. *See Presearch, Inc.,* 94–2 C.P.D. ¶ 197 at 4–5 (1994). Moreover, this apparent equal treatment of the two offerors' cost proposals refutes plaintiff's claim of bad faith.

Second, the agency's violation did not affect Labat's chances of receiving the BICSN contract because, at best, an RFP amendment relating to use of the TAF would only have led Labat to modify its cost proposal, not its technical proposal. Labat's second BAFO was eliminated from the competition after evaluation of its technical proposal revealed that it was technically unacceptable.

---

79. In addition, plaintiff asserts that the RFP was defective because it did not state that this type of funding could be shifted to the TAF. The GAO found, however, that plaintiff apparently proposed similar cost-shifting in its own second BAFO. *See Labat,* 92–2 C.P.D. ¶ 244 at 7 n. 1.

Furthermore, we have held *supra* that Labat's BAFO was properly found to be technically unacceptable. Plaintiff, therefore, cannot establish that it was prejudiced by any defect in the RFP. *See CACI,* 13 Cl.Ct. at 728–29.

Kenyon, therefore, properly rejected Labat's BAFO without reviewing the cost proposal. As a result, Labat could not have been prejudiced by the agency's failure to amend the RFP to allow explicitly cost-shifting in the offerors' cost proposals.

The most that plaintiff can establish, therefore, is a non-prejudicial violation of the FAR. This does very little, if anything, to advance plaintiff's bad faith count because violations of procurement law, without more, cannot establish bad faith government conduct. For this reason, the Federal Circuit and the Court of Claims have considered bad faith conduct and violations of procurement statutes or regulations as distinct considerations for purposes of determining whether agency conduct is arbitrary or capricious. *See Southfork*, 141 F.3d at 1132; *Keco II*, 492 F.2d at 1203–04. The court holds that the agency's error with regard to TAF cost-shifting provides no support for a finding that AID acted with malice toward plaintiff, or that it gave preferential treatment to Chemonics.

### c. Misrepresentations Regarding Mr. Hazlewood

Plaintiff alleges that Hazlewood misrepresented his employment and salary history on his biographical data sheet, which was included in Chemonics' cost proposal. In particular, Hazlewood failed to disclose that Dimpex, the company of which he was president, had filed for Chapter 7 bankruptcy in 1989. Plaintiff contends that AID was aware of Dimpex's financial problems because (1) Dimpex owed money to AID from other contracts, and (2) counsel for Raymond Malley, a subcontractor to Dimpex on a prior AID contract, had notified AID's Administrator that Dimpex had "defaulted" on a subcontract payment of over $23,000 and was "insolvent." Pl.'s App. at 476. Labat argues that the agency's failure to consider the financial health of Dimpex when evaluating Chemonics' BAFO demonstrates bad faith.

Plaintiff has presented no evidence, however, that the BICSN contracting officials who evaluated Chemonics' final technical proposal and determined it to be acceptable—the four members of the second TEC and Kenyon—had any actual knowledge of Dimpex's financial troubles prior to Labat's third GAO protest. The documents submitted by plaintiff establish that the Administrator and Acting General Counsel of AID, located in Washington, D.C., were aware that Dimpex was undergoing some financial difficulties in August of 1990, and that the company may have been insolvent. But there is no evidence that this information was disseminated throughout the agency in general, or to the contracting staff in South Africa in particular.[80] Nor has plaintiff alleged that AID officials in Washington, D.C. were under any duty to disseminate this information either agency-wide or specifically to the BICSN contracting staff. In fact, there is no reason why these officials would have known that an offeror on a contract in South Africa had proposed a candidate who was an officer of Dimpex.[81]

■ Furthermore, assuming that the BICSN contracting officials had no actual or imputed knowledge of Dimpex's financial history, they were under no duty to investigate the representations in Hazlewood's biographical data sheet regarding Dimpex. The GAO has consistently held that "an agency may accept an offeror's representations of its experience unless there is reason to believe that the representations are inaccurate." *State Management Servs., Inc.*, 95–1 C.P.D. ¶ 25 at 5 (1995) (upholding agency's reliance upon representation of the awardee's past contract experience; awardee failed to disclose that most of its prior contracts had been performed by a recently sold division); *see also Seair Transp. Servs., Inc.*, 93–1 C.P.D. ¶ 458 at 5 (1993) (upholding agency's reliance upon awardee's representations of its president's past experience); *Roy F. Weston, Inc.*, 80–1 C.P.D. ¶ 340 at 14 (1980) (upholding agency's reliance upon represen-

---

80. Kenyon stated in his November 1997 declaration that he learned of Dimpex's bankruptcy filing after Labat filed its third GAO protest.

81. Moreover, plaintiff has presented no theory under which the knowledge of AID officials in Washington should be imputed to the BICSN contracting personnel. Even if it could, specific intent to injure Labat cannot arise from a failure to consider imputed knowledge regarding one of Chemonics' proposed employees.

tation of past employment and finding no general duty to investigate references). The court finds this line of GAO decisions, and case law in accord with these decisions, *see Strategic Analysis, Inc. v. United States Dep't of Navy,* 939 F.Supp. 18, 25 (D.D.C. 1996), persuasive and elects to follow them. Consequently, the court holds that Kenyon and the TEC were entitled to accept Hazlewood's representations regarding Dimpex as accurate. Because these AID officials did not act improperly, the court concludes that their actions cannot support any assertion of bad faith conduct.

#### d. Misrepresentations Regarding Mr. Molebatsi

Plaintiff asserts that Chemonics misrepresented the commitment of Molebatsi to Chemonics' team. Specifically, plaintiff contends that Chemonics represented Molebatsi as one of its IDS candidates, knowing that he would never accept employment with the company, because the salary offered (and presented in Chemonics' cost proposal), was significantly below his then-current salary with another employer. Moreover, to show bad faith, plaintiff alleges that Kenyon "ignored evidence of a salary differential that should have raised a red flag regarding memorandum's ability to serve on Chemonics' team." Pl. Reply Br. at 23. In response, defendant argues that AID was entitled to rely on the biographical data sheet submitted with Chemonics' cost proposal, which stated the proposed salary and was signed by Molebatsi.

Plaintiff is essentially alleging that Chemonics engaged in a "bait and switch" strategy by proposing a candidate that it knew would not become part of its team. The GAO has proposed the following test:

> [T]he term "bait and switch" generally refers to an offeror's misrepresentation in its proposal of the personnel that it expects to use during contract performance. Where such a misrepresentation materially influences an agency's evaluation of an offeror's proposal, it undermines the integrity of the competitive procurement system and generally provides a basis for proposal rejection or termination of a contract award based upon the proposal.

To demonstrate a "bait and switch," a protester must show not only that personnel other than those proposed are performing the services—i.e., the "switch"—but also that: (1) the awardee represented in its proposal that it would rely on certain specified personnel in performing the services; (2) the agency relied on this representation in evaluating the proposal; and (3) it was foreseeable that the individuals named in the proposal would not be available to perform the contract work.

*Ann Riley & Assocs., Ltd.—Reconsideration,* 97–1 C.P.D. ¶ 122 at 2–3 (1997) (citing *Informatics, Inc.,* 57 Comp.Gen. 217, 78–1 C.P.D. ¶ 53 (1978) and numerous other prior GAO decisions). The court finds this test reasonable and will apply it here. *Cf. Planning Research Corp. v. United States,* 971 F.2d 736, 741 (Fed.Cir.1992) (citing *Informatics* and other GAO "bait and switch" decisions with approval).

Although plaintiff has established a "switch"—Molebatsi never accepted Chemonics' offers of employment—it has not presented evidence to establish a genuine issue regarding a misrepresentation by Chemonics. To be more specific, there has been no showing that it was foreseeable to Chemonics that Molebatsi would not accept employment. Mr. Molebatsi himself admits that he furnished Chemonics with a letter of intent to work on BICSN project, and the biographical data sheet which he signed acknowledged his agreement that Chemonics would propose him as one of its IDS candidates at a salary of 98,241 rands. Moreover, he continued discussions with Chemonics regarding his employment on the BICSN project into June of 1992. His statement that Chemonics "knew prior to March 1992" that it would not hire him lacks any foundation. Based upon this evidence, the court must conclude that, as of March 19, 1992—the date Chemonics submitted its second BAFO—Chemonics did not misrepresent its intention to hire Molebatsi for the project, if selected for award.

As a direct consequence, plaintiff has failed to support its allegation that AID acted in bad faith by relying on Molebatsi's letter of intent and biographical data sheet. There has been no showing that Kenyon had any

reason to question Molebatsi's certification that he was committed to work for Chemonics at the stated salary. *See State Management Servs.,* 95–1 C.P.D. ¶ 25 at 5; *Seair Transp. Servs.,* 93–1 C.P.D. ¶ 458 at 5. The court must conclude, therefore, that AID's actions with respect to Molebatsi do not support plaintiff's bad faith assertion.

### 5. Payment of Chemonics' "Stop Work" Claims

Labat asserts that AID's payments to Chemonics during the "stop work" periods further demonstrate AID's bad faith conduct. In the period between contract award on September 26, 1991, and ratification of Chemonics' contract following the second round of BAFOs on April 10, 1992, the contract was suspended for a total of approximately five months. For this period, Chemonics submitted invoices totaling $330,393.57 and eventually received payments totaling $325,966.53. Plaintiff claims that the agency's payment of these expenses provides further evidence that AID never intended to award the contract to Chemonics, regardless of the merits of Labat's proposals.

This basis for plaintiff's claim of bad faith conduct is contrary to the language of two provisions of the FAR. First, FAR 52.233–3, the Protest After Award clause, authorizes federal agencies to issue stop-work orders upon receiving notice of a bid protest, and requires contracting officers to make an equitable adjustment in the "estimated cost, the fee, or a combination thereof" if the stop-work order results "in an increase in the time required for, or in the Contractor's cost allocable to" the performance of the contract. 48 C.F.R. § 52.233–3(a) & (b). This clause must be inserted in "all solicitations and contracts" pursuant to FAR 33.106(b). Although Chemonics' contract did not explicitly include this clause, either directly or by reference, the clause may be incorporated into the contract by operation of law according to the *Christian* Doctrine. *See S.J. Amoroso Constr. Co. v. United States,* 12 F.3d 1072, 1075 (Fed.Cir.1993); *G.L. Christian & Assocs. v. United States,* 160 Ct.Cl. 1, 312 F.2d 418 (Ct.Cl.), *cert. denied,* 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963).

■ The *Christian* Doctrine does not require that all mandatory FAR clauses are automatically incorporated by operation of law into a contract. *See General Eng'g & Machine Works v. O'Keefe,* 991 F.2d 775, 779 (Fed.Cir.1993). Rather, the doctrine incorporates only those mandatory clauses that (1) "express a significant or deeply ingrained strand of public procurement policy," or (2) are "not written to benefit or protect the party seeking incorporation." *See id.* at 779–80. The court holds that the Protest After Award clause should be incorporated into Chemonics' contract under either ground.

■ Regarding the first basis for incorporation, the clause expresses a significant strand of public procurement policy because it implements section 2741 of the Competition in Contracting Act of 1984 ("CICA"), Pub.L. No. 98–369, 1984 U.S.C.C.A.N. (98 Stat.) 1199, 1200 (codified at 31 U.S.C. § 3553 (1994)). 31 U.S.C. § 3553(d)(1) requires federal agencies to suspend contract performance if they receive notice of a GAO protest within ten days of the date of contract award. This statutory provision serves the valuable purposes of: (1) reducing the Government's liability in the event that a bid protest is successful and the Government is required to terminate the contract for convenience; and (2) preserving the opportunity for receipt of contract award for a party that succeeds in a post-award protest.

FAR 52.233–3(a) implements section 3553(d)(1) by granting contracting officers authority to issue stop-work orders upon receipt of notice of a bid protest and establishing procedural requirements for the issuance and cancellation of such orders. It therefore plays a valuable role in the implementation of a significant statutory provision pertaining to the award of government contracts.

The second basis stated in *General Engineering* for incorporation of a mandatory contract clause under the *Christian* Doctrine is that the clause serves to protect or benefit another entity. *See General Engineering,* 991 F.2d at 780 (citing *Chris Berg, Inc. v. United States,* 192 Ct.Cl. 176, 426 F.2d 314, 317 (Ct.Cl.1970)). That condition is satisfied here because Chemonics is the primary bene-

ficiary of the clause, but is not a party to this bid protest.

The court concludes that the Protest After Award clause should be incorporated into Chemonics' contract, regardless of whether the clause was intentionally or inadvertently omitted by AID. *See Amoroso,* 12 F.3d at 1075. This conclusion comports with one decision by the Armed Services Board of Contract Appeals ("ASBCA" or "Board").[82] *See COMSI, Inc.,* 88–1 B.C.A. (CCH) ¶ 20,-245 at 102,476 (ASBCA 1987) (holding that FAR 52.233–3 should be incorporated into a contract, but without providing any analysis), *rev'd in part on reconsideration on other grounds,* 88–1 B.C.A. (CCH) ¶ 20,492 (1988). Moreover, equitable adjustments under this clause may include compensation for labor costs paid to employees idled during the period of contract suspension. *See, e.g., AST Anlagen-und Sanierungstechnik GmbH,* 92–2 B.C.A. (CCH) ¶ 24,961 (ASBCA 1992).

The second FAR provision that authorizes reimbursement for expenses incurred as a result of a stop-work order is FAR 52.212–13, the Stop–Work Order clause, which was incorporated by reference in Chemonics' contract. This clause directs contracting officers to grant equitable adjustment for costs incurred as a result of stop-work orders, provided the contractor timely asserts its right to the adjustment. *See* 48 C.F.R. § 52.212–13(b).[83] The clause requires a contracting officer to allow an adjustment in "the estimated cost, the fee, or a combination thereof," *id.* (alternate I), and thus permits

reimbursement for costs incurred to retain personnel during the stop-work period. Moreover, it requires reimbursement even if the contract is subsequently terminated either for default or for the convenience of the Government. *See id.* § 52.212–13(c) & (d). AID would have been required, therefore, to reimburse Chemonics even if the agency awarded the contract to Labat after the second round of BAFOs.

Plaintiff also asserts that Chemonics' willingness to incur potentially unreimbursable expenses suggests that AID assured Chemonics reimbursement would be forthcoming. This suggestion is unsupported and, in fact, directly contrary to the agency's repeated denials of Chemonics' claims for reimbursement for expenses incurred during contract suspensions, prior to AID's decision in July 1992 to reimburse Chemonics.

 AID was justified, therefore, in reimbursing Chemonics for *legitimate* expenses incurred to retain key employees during the stop-work period, and such reimbursement would provide no support for plaintiff's allegation of bad faith. Nevertheless, one aspect of AID's payments appears to support plaintiff's assertion: the agency reimbursed Chemonics for more than $45,000 in legal fees that the company billed to AID from December 1991 through March 1992. It appears that these legal fees may have been incurred by the company's intervention in Labat's first GAO protest. It is not clear whether AID was obligated to reimburse an awardee for

---

82. The court's holding that the Government may be obligated to compensate the contractor in the absence of a Protest After Award clause is at odds with the holding of the ASBCA in *Tempo, Inc.,* 95–2 B.C.A. (CCH) ¶ 27,618, 1995 WL 152861 (ASBCA 1995). In that case, the Board held that a stop-work order issued pursuant to the mandate of section 3553 "is deemed a sovereign act and, as such, cannot serve as the basis for liability of the Government for the consequences thereof." *Id.* at 137,679. As here, the contract at issue in *Tempo* did not include the Protest After Award clause. The appellant in *Tempo,* however, did not raise the issue of incorporation under the *Christian* Doctrine and the Board thus had no need to address that issue. *Tempo* is therefore distinguishable from the present case.

To the extent that *Tempo* stands for the proposition that stop-work orders issued pursuant to section 3553 are sovereign acts, and thus con-

tractors cannot receive compensation for expenses incurred due to such orders, this court declines to follow that decision. FAR 52.233–3, a mandatory contract clause, addresses explicitly this question and requires agencies to grant equitable adjustments when the prescribed conditions are satisfied. It should be noted that the sole authority on which *Tempo* relied—*Port Arthur Towing Co.,* 90–2 B.C.A. (CCH) ¶ 22,857, 1990 WL 101360 (ASBCA 1990)—involved a contract not subject to the FAR. *See id.* at 114,818. The Board, therefore, had no opportunity in that case to consider incorporation of the Protest After Award clause.

83. This clause was redesignated as FAR 52.242–15 on September 18, 1995. *See* 60 Fed.Reg. 48,251, 48,256 (1995); 48 C.F.R. § 52.242–15 (1998).

legal fees, especially legal fees incurred in an unsuccessful defense of a contract award that violated several procurement regulations. Without further factual or legal development, therefore, the court is constrained to reserve this as a potential ground of support for plaintiff's motion for summary judgment on count I.

One other issue surrounding the sequence of stop-work orders is of concern to the court. On February 18, 1992—the date GAO issued its opinion sustaining Labat's first protest—Kenyon canceled the stop-work order, thus allowing Chemonics to resume performance under the original contract. The record contains no explanation for this action.

Section (a) of the Protest After Award clause states: "Upon receipt of the final decision in the [GAO] protest, the contracting officer shall either—(1) Cancel the stop-work order; or (2) Terminate the work covered by the order...." *Id.* § 52.233–3(a). This provision provides a contracting officer with two options. It would appear, however, that these options are related to the two possible outcomes of a GAO protest: the protest may be denied or sustained. Logically, the contracting officer should cancel the stop-work order, thus allowing the contract performance to resume, if the GAO denies a protest; and should terminate the existing contract if the protest is sustained. Here, Kenyon chose to cancel the stop-work order even though Labat's protest had been sustained. This action appears somewhat perverse in light of the GAO's holding that AID had committed violations of procurement regulations during the first competition, and its recommendation that the agency should reopen discussions with Chemonics and Labat.

Kenyon's action offers potential support to plaintiff's motion for summary judgment on count I. There is insufficient evidence, however, before the court to ascertain Kenyon's rationale in canceling the stop-work order, and thus to conclude that his actions evidenced bad faith. This issue, too, must be preserved.

### 6. Alleged Misrepresentations by AID to GAO

Plaintiff alleges that AID misrepresented the existence of a cost-realism study to GAO during the second GAO protest in an effort to reinforce the appearance that the BICSN procurement was conducted in compliance with the FAR. Presumably, plaintiff is asserting that this alleged misrepresentation provides direct evidence of the AID's intent to injure plaintiff by thwarting its efforts to seek relief through its GAO protest. The defendant asserts that the GAO's reference to a "cost realism analysis" was either a loose reference to a document submitted by AID as an attachment to its agency report in the second GAO protest, or the result of reliance upon inaccurate representations by Chemonics' counsel that a cost-realism study existed.

All of the evidence before the court refutes any suggestion that AID represented the existence of a cost-realism study to GAO. The agency presented GAO with an exhibit which analyzed the cost savings obtained by Chemonics by reducing its proposed performance period from five years to 53 months, but this exhibit was not labeled a "cost realism analysis" or referred to as such by the agency in the text of its report. It appears that GAO was referring to this document in its decision. Nevertheless, plaintiff has presented no evidence that AID misrepresented to GAO that it had performed a cost-realism analysis. Consequently, this allegation does not support plaintiff's assertion of bad faith conduct.

### 7. Ratification of the Initial Contract Award

The final evidence presented by plaintiff to support its motion for summary judgment concerns the agency's actions following the selection of Chemonics after the second competition. Rather than terminate the existing contract with Chemonics and award a new contract at the total CPFF of $8,850,498 proposed in the company's second BAFO, Kenyon "ratified" the prior contract award of $10,183,060. Defendant failed to present any explanation justifying this action.

The court is troubled by Kenyon's ratification of the September 1991 contract at a CPFF more than $1.3 million above Chemonics' best and final offer. This action may

have allowed Chemonics to receive payments substantially in excess of the monies to which it was entitled.[84] In light of the defendant's inability to present any rational explanation for Kenyon's action, the court finds that the record on this issue tends to support plaintiff's motion for summary judgment on count I. Without further factual or legal development, however, the court is unprepared, given its rejection of virtually all other bases for count I, to assess this datum as a ground for sustaining a claim of bad faith. In view of the two other issues discussed above,[85] which raise questions about the bona fides of the agency's treatment of Chemonics, and thus, Labat, the court concludes that further briefing and perhaps factual development is needed before it can be determined: (1) if the agency's conduct can be explained either as a matter of fact or law; and (2) if it cannot, whether that inability is evidence of bad faith.

## CONCLUSION

For the reasons set out above, defendant's cross-motion for summary judgment on count II is granted and plaintiff's motion is denied as to count II. With respect to count I, although the court accepts virtually all of the bases of defendant's motion, summary judgment is denied as to both parties without prejudice because three unresolved issues remain: (1) AID's rationale for reimbursing Chemonics for its legal fees; (2) the agency's justification for lifting the stop-work order on February 18, 1992; and (3) AID's explanation for the contracting officer's decision not to terminate the original contract and his ultimate ratification of the original contract.[86] The court will contact the parties to arrange a status conference to discuss how these issues should be addressed.

---

84. This would include not only the $8,850,498 CPFF submitted in its second BAFO, but also the legitimate reimbursable expenses the company incurred prior to April 10, 1992. This latter amount would not include legal fees incurred by intervening in Labat's first GAO protest.

The present record does not reflect the total payments received by Chemonics under the BICSN contract.

85. See supra § C.5.

86. And, if applicable, the rationale for any payments exceeding the CPFF proposed by Chemonics in its second BAFO